## ANDERSON v. UNITED STATES.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 181. Argued February 25, 28, 1898. — Decided October 24, 1898.

The Traders' Live Stock Exchange was an unincorporated association in Kansas City, whose members bore much the same relation to it, and through it carried on much the same business as that carried on by the members of the Kansas City Live Stock Exchange, considered and passed upon in *Hopkins* v. *United States,* just decided. The main difference was, that the members of the Traders' Exchange, defendants in the present proceedings, were themselves purchasers of cattle on the market, while the defendants in the former case were commission merchants who sold cattle upon commission as a compensation for their service. The articles of association of the Traders' Exchange contained the following preamble : "We, the undersigned, for the purpose of organizing and maintaining a business exchange, not for pecuniary profit or gain, but to promote and protect all interests connected with the buying and selling of live stock at the Kansas City Stock Yards, and to cultivate courteous and manly conduct towards each other, and give dignity and responsibility to yard traders, have associated ourselves together under the name of Traders' Live Stock Exchange, and hereby agree, each with the other, that we will faithfully observe and be bound by the following rules and by-laws and such new rules, additions or amendments as may from time to time be adopted in conformity with the provisions thereof from the date of organization." The rules objected to in the bill in this case were the following : " Rule 10. This exchange will not recognize any yard trader unless he is a member of the Traders' Live Stock Exchange. Rule 11.

When there are two or more parties trading together as partners, they shall each and all of them be members of this exchange. Rule 12. No member of this exchange shall employ any person to buy or sell cattle unless such person hold a certificate of membership in this exchange. Rule 13. No member of this exchange shall be allowed to pay any order buyer or salesman any sum of money as a fee for buying cattle from or selling cattle to such party." *Held :*

(1) That this court is not called upon to decide whether the defendants are or are not engaged in interstate commerce, because if it be conceded they are so engaged, the agreement as evidenced by the by-laws is not one in restraint of that trade, nor is there any combination to monopolize or attempt to monopolize such trade within the meaning of the act;

(2) That, following the preceding case, in order to come within the provisions of the statute the direct effect of an agreement or combination must be in restraint of that trade or commerce which is among the several States, or with foreign nations ;

(3) That where the subject-matter of the agreement does not directly relate to and act upon and embrace interstate commerce, and where the undisputed facts clearly show that the purpose of the agreement was not to regulate, obstruct or restrain that commerce, but that it was entered into with the object of properly and fairly regulating the transaction of the business in which the parties to the agreement were engaged, such agreement will be upheld as not within the statute, where it can be seen that the character and terms of the agreement are well calculated to attain the purpose for which it was formed, and where the effect of its formation and enforcement upon interstate trade or commerce is in any event but indirect and incidental, and not its purpose or object;

(4) That the rules are evidently of a character to enforce the purpose and object of the exchange as set forth in the preamble, and that for such purpose they are reasonable and fair, and that they can possibly affect interstate trade or commerce in but a remote way, and are not void as violations of the act of Congress.

This suit is somewhat similar to the *Hopkins suit,* just decided, and was brought by the United States against the defendants named, who were citizens and residents of the Western Division of the Western District of Missouri and members of a voluntary unincorporated association known and designated as the Traders' Live Stock Exchange, the suit being brought for the purpose of obtaining a decree dissolving the exchange and enjoining the members thereof from entering into or continuing any sort of combination to deprive any people engaged in shipping, selling, buying and handling

live stock (received from other States and from the Territories, intended to be sold at the Kansas City market), of free access to the markets at Kansas City, and to the same facilities afforded by the Kansas City stock yards, to defendants and their associate members of the Traders' Live Stock Exchange.

The bill was filed under the direction of the Attorney General of the United States by the United States District Attorney for the Western District of Missouri. It alleged in substance that the exchange was governed by a board of eight directors, who carried on the business thereof with the consent and approbation of the defendants, they personally being members of the exchange. It then made the same allegations in relation to the stock yards being partly in Kansas City, Kansas, and partly in Kansas City, Missouri, that are contained in the bill in the *Hopkins case*, just decided, and also as to the sales of herds or droves of cattle which were at the time of the sale partly in one State and partly in another. It is further alleged that the Kansas City stock yards are a public market, and, next to the market at Chicago in the State of Illinois, the largest live stock market in the world, and vast numbers of cattle, hogs and other live stock are received annually at the market, shipped from various States and from the Territories, and are sold at the market to buyers who reside in other States and Territories, and who reship the stock; that the stock is shipped to the market under contracts by which the shipper is permitted to unload the stock at the Kansas City stock yards, rest, water and feed the same, and is accorded the privilege of selling the stock on the Kansas City market if the prices prevailing at the time justify the sale, and many head of such stock are so sold; that prior to the month of March, 1897, as alleged, the defendants herein were engaged as speculators at the Kansas City stock yards, and were buying upon the market and reselling upon the same market and reshipping to other markets in other States the cattle so received at the Kansas City stock yards; that all the live stock shipped to and received at these stock yards is consigned to commission merchants, who take charge of the stock when it is received, and who sell the same

to packing houses located at Kansas City, Missouri, and Kansas City in the State of Kansas, and they sell large numbers of cattle to the defendants herein.

The bill then alleges that the defendants "have unlawfully entered into a contract, combination and conspiracy in restraint of trade and commerce among the several States and with foreign nations, in this, to wit, that they have unlawfully agreed, contracted, combined and conspired to prevent all other persons than members of the Traders' Live Stock Exchange, as aforesaid, from buying and selling cattle upon the Kansas City market at the Kansas City stock yards as aforesaid; that the commission, firm, person, partnership or corporation to whom said cattle are consigned at Kansas City, as aforesaid, is not permitted to and cannot sell or dispose of said cattle at the Kansas City market as aforesaid to any buyer or speculator at the Kansas City stock yards unless said buyer or speculator is a member of the Traders' Live Stock Exchange, and these defendants (and each of them), unlawfully and oppressively refuse to purchase cattle, or in any manner negotiate or deal with or buy from any commission merchant who shall sell or purchase cattle from any speculator at the said Kansas City stock yards who is not a member of the said Traders' Live Stock Exchange; that by and through the unlawful agreement, combination and conspiracy of these defendants the business and traffic in cattle at the said Kansas City stock yards is interfered with, hindered and restrained, thus entailing extra expense and loss to the owner, and placing an obstruction and embargo on the marketing of cattle shipped from the States and Territories aforesaid to the Kansas City stock yards."

It is further alleged that, acting in pursuance of the unlawful combination above described, the board of directors of the exchange have imposed fines upon certain members of the exchange "who had traded with persons, speculators upon the markets, who were not members of the said live stock exchange, and within three months last past have imposed fines upon members of said live stock exchange who have traded with commission firms at said Kansas City stock yards

which said commission firms had bought from, and sold cattle to speculators upon said market who were not members of the said live stock exchange."

It was further stated in the bill that in carrying out the purposes and aims of this exchange and by the conduct of its members engaged in this alleged combination, conspiracy and confederation, they were acting in violation of the laws of the United States, and particularly in violation of section 1 of the act of Congress, approved July 2, 1890, c. 647, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," 26 Stat. 209, and in the prosecution of this unlawful combination they had agreed to hinder and delay the business of buying and selling cattle at the market named and had confederated together in restraint of trade and commerce between the States, and that the object of the defendants in organizing the exchange was to prevent the sale by any commission merchant at the Kansas City stock yards of any cattle to any person who might be a buyer and speculator upon the market who is not a member of the exchange.

Accompanying this bill were several affidavits of individuals not members of the exchange, but who were traders or speculators at the stock yards, and those persons said that they were acquainted with the association in question and with the officers and members, and that they did everything in their power to prevent other persons who were not members from trading at the stock yards, and a number of instances were given in which the affiants who were not members of the exchange were endeavoring to do business with commission merchants and others at the exchange in question, when the affiants were notified that they could not continue in business unless they became members of the association, and where partnerships were engaged in business where one partner was a member of the association, the partner who was a member was notified that he could not continue in the partnership business with the other unless such other also became a member ; that they had attempted to buy cattle from a great many commission firms and from their salesmen at these stock yards,

but as soon as they went into the yards where the cattle were that were consigned to commission firms and attempted to purchase them, some of the defendants would appear, call the salesman aside, and, after having a conversation with such salesman, the latter would invariably return to affiant and say that he could not price cattle to the affiant or sell the same to him, as he had been warned by members of the exchange not to do so; that the Traders' Live Stock Exchange would not permit other traders and speculators upon the market, and that the exchange does not permit commission firms at the stock yards to sell cattle consigned to them to any trader or speculator upon the market who is not a member of the exchange, and that commission firms had been notified by the officers of the stock exchange not to sell to speculators on the market who were not members of the Live Stock Exchange, and where commission firms sold cattle to traders and speculators upon the market who were not members of the exchange, the association and members thereof would boycott the commission firm making such sales, and refuse to purchase any cattle from them, and refuse to go into the lots and look at cattle which had been consigned to them.

Upon the bill and affidavits application was made to the Circuit Court for the Western Division of the Western District of Missouri for an injunction as prayed for in the bill, in opposition to which application various affidavits were read on the part of the defendants, and copies of the articles of association and by-laws of the exchange were attached to the affidavit of the president of the exchange and read on the motion.

Among other affidavits was that of the general superintendent of the stock yards company, who said that he had known the organization, the Traders' Live Stock Exchange, since its formation, and that it had been a benefit to the live stock market at Kansas City by furnishing constant buyers for cattle shipped to the market, no matter how large the receipts for any one day or series of days might be, and also by raising the standard of business integrity among its members, because it required every member to comply with his business promises

and verbal agreements; that no embargo was placed upon any one purchasing or desiring to purchase cattle at the yards, but a free and open market was offered to all buyers and sellers; that the members of the organization were engaged in the business of buying and selling cattle on the market, and were competitors among and against each other; that their organization did not restrain or interfere with interstate or local commerce, and the members did not monopolize or attempt to monopolize the business of buying and selling cattle at Kansas City, nor did the organization in any manner tend to limit or decrease the number of cattle marketed at Kansas City, but that it had the contrary effect; that about eighty-five per cent of the total receipts for the years 1895, 1896 and 1897 at the Kansas City market of cattle had been billed to the Kansas City market alone for purposes of sale there.

Other affidavits were presented to the same effect. Also the affidavit of the president of the exchange. The president denied all allegations in relation to conspiracies to prevent other persons than members of the exchange from buying and selling cattle upon the Kansas City market, and on the contrary alleged that in buying cattle the defendants were in competition with each other, with the representative buyers of all the packing houses, with the representatives of the various commission merchants who buy constantly on orders from a distance, and with others who buy on orders on their own account, none of whom are members of the exchange, and that with these various classes of buyers the defendants constantly deal, and that in selling cattle they compete with each other and with shippers and commission merchants offering stock for sale on the market; that the business in which these defendants are engaged is that of buying and selling cattle known as "stockers and feeders;" that the business is purely local to that market; that the defendants do not deal in quarantine cattle subject to government inspection or cattle shipped through to other markets, with or without the privilege of the Kansas City market, nor in fat cattle sold on the local market shipped to other States or to foreign countries; that except in rare instances both purchases and sales made

by the defendants are made from and to persons not members of the exchange, and that in the judgment of the president about ninety-nine per cent of the transactions by the defendants are with persons not members of the exchange.

A copy of the articles of association is annexed to the affidavit, which contains the following preamble:

"We, the undersigned, for the purpose of organizing and maintaining a business exchange, not for pecuniary profit or gain, but to promote and protect all interests connected with the buying and selling of live stock at the Kansas City Stock Yards, and to cultivate courteous and manly conduct towards each other, and give dignity and responsibility to yard traders, have associated ourselves together under the name of Traders' Live Stock Exchange, and hereby agree, each with the other, that we will faithfully observe and be bound by the following rules and by-laws and such new rules, additions or amendments as may from time to time be adopted in conformity with the provisions thereof from the date of organization."

Rules 10, 11, 12 and 13 are as follows:

"Rule 10. This exchange will not recognize any yard trader unless he is a member of the Traders' Live Stock Exchange.

"Rule 11. When there are two or more parties trading together as partners, they shall each and all of them be members of this exchange.

"Rule 12. No member of this exchange shall employ any person to buy or sell cattle unless such person hold a certificate of membership in this exchange.

"Rule 13. No member of this exchange shall be allowed to pay any order buyer or salesman any sum of money as a fee for buying cattle from or selling cattle to such party."

These are the rules which are specially obnoxious to the complainants, and are alleged to be in their effect in violation of the Federal statute above mentioned.

*Mr. R. E. Ball* for Anderson and others. *Mr. I. P. Ryland* and *Mr. John L. Peak* were on his brief.

*Mr. John R. Walker* for the United States. *Mr. Solicitor General* was on his brief.

MR. JUSTICE PECKHAM, after stating the case, delivered the opinion of the court.

There is really no dispute in regard to the facts in the case. Although the bill contains various allegations in regard to conspiracies, agreements and combinations in restraint of trade and in violation of the Federal statute, yet there is no evidence of any act on the part of the defendants preventing access to the yards or preventing purchases and sales of cattle by any one, other than as such sales may be prevented by the mere refusal on the part of the defendants as "yard traders" to do business with those who are also yard traders, but are not members of the exchange, or with commission merchants where such commission merchants themselves do business with yard traders who are not members of the exchange. In other words, there is no evidence and really no charge against the defendants that they have done anything other than to form this exchange and adopt and enforce the rules mentioned above, and the question is whether by their adoption and by peacefully carrying them out without threats and without violence, but by the mere refusal to do business with those who will not respect their rules, there is a violation of the Federal statute.

This case differs from that of *Hopkins* v. *United States, supra,* in the fact that these defendants are themselves purchasers of cattle on the market, while the defendants in the *Hopkins case* were only commission merchants who sold the cattle upon commission as a compensation for their services.

Counsel for the Government assert that any agreement or combination among buyers of cattle coming from other States, of the nature of the by-laws in question, is an agreement or combination in restraint of interstate trade or commerce.

The facts first set forth in the complainants' bill upon which to base the claim that the business of defendants is interstate commerce, we have already decided in the *Hopkins case* to be immaterial. The particular situation of the yards, partly in Kansas and partly in Missouri, we there held was a fact without any weight, and one which did not make business inter-

state commerce which otherwise would not partake of that character.

There remain in the bill of the complainants the allegations that the cattle come from various States and are placed on sale at these stock yards which form the only available market-for many miles around, and that they are sold by the commission merchants and are bought in large numbers by the defendants who have entered into what the complainants allege to be a contract, combination and conspiracy in restraint of trade and commerce among the several States, which contract, etc., it is alleged is carried out by defendants unlawfully and oppressively refusing to purchase cattle from a commission merchant who sells or purchases cattle from any speculator (yard trader) who is not a member of the exchange; and it is further alleged that by these means the traffic in cattle at the Kansas City stock yards is interfered with, hindered and restrained, and extra expense and loss to the owner incurred, and that thereby the defendants have placed an obstruction and embargo on the marketing of cattle shipped from other States. All these results are alleged to flow from the agreement among the defendants as contained in the by-laws of their association, particularly those numbered ten, eleven, twelve and thirteen, copies of which are set forth in the statement of facts herein.

There is no evidence that these defendants have in any manner other than by the rules above mentioned hindered or impeded others in shipping, trading or selling their stock, or that they have in any way interfered with the freedom of access to the stock yards of any and all other traders and purchasers, or hindered their obtaining the same facilities which were therein afforded by the stock yards company to the defendants as members of the exchange, and we think the evidence does not tend to show that the above results have flowed from the adoption and enforcement of the rules and regulations referred to.

In regard to rule 10, the question is whether, without a violation of the act of Congress, persons who are engaged in the common business as yard traders of buying cattle at the

Kansas City stock yards, which come from different States, may agree among themselves that they will form an association for the better conduct of their business, and that they will not transact business with other yard traders who are not members, nor will they buy cattle from those who also sell to yard traders who are not members of the association.

It will be remembered that the association does no business itself. Those who are members thereof compete among themselves and with others who are not members, for the purchase of the cattle, while the association itself has nothing whatever to do with transportation nor with fixing the prices for which the cattle may be purchased or thereafter sold. Any yard trader can become a member of the association upon complying with its conditions of membership, and may remain such as long as he comports himself in accordance with its laws. A lessening of the amount of the trade is neither the necessary nor direct effect of its formation, and in truth the amount of that trade has greatly increased since the association was formed, and there is not the slightest evidence that the market prices of cattle have been lowered by reason of its existence. There is no feature of monopoly in the whole transaction.

The defendants are engaged in buying what are called "stockers and feeders;" being cattle not intended for any other market, and the demand for which is purely local. They have arrived at their final destination when offered for sale, and there is free and full competition for their purchase between all the members of the exchange, as well as between them and all buyers not members thereof, who are not also yard traders. With the latter the defendants will not compete, nor will they buy of the commission men if the latter continue to sell cattle to such yard traders.

Have the defendants the right to agree to conduct their own private business in this way?

Whether there is any violation of the act of Congress by the adoption and enforcement of the other rules of the association, above referred to, will be considered hereafter.

It is first contended on the part of the appellants that they

are not engaged in interstate commerce or trade, and that therefore their agreement is not a violation of the act. They urge that the cattle, by being taken from the cars in which they were transported and placed in the various pens hired by commission merchants at the cattle yards of Kansas City, and there set up for sale, have thereby been commingled with the general mass of other property in the State, and that their interstate commercial character has ceased within the decisions of this court in *Brown* v. *Houston*, 114 U. S. 622, and *Pittsburg and Southern Coal Co.* v. *Bates*, 156 U. S. 577.

On the other hand, it is answered that the cases cited involved nothing but the general power of the State to tax all property found within its limits, by virtue of general laws providing for such taxation, where no tax is levied upon the article or discrimination made against it by reason of the fact that it has come from another State, and it is maintained that the agreement in question acts directly upon the subject of interstate commerce and adds a restraint to it which is unlawful under the provisions of the statute.

In the view we take of this case we are not called upon to decide whether the defendants are or are not engaged in interstate commerce, because if it be conceded they are so engaged, the agreement as evidenced by the by-laws is not one in restraint of that trade, nor is there any combination to monopolize or attempt to monopolize such trade within the meaning of the act.

It has already been stated in the *Hopkins case*, above mentioned, that in order to come within the provisions of the statute the direct effect of an agreement or combination must be in restraint of that trade or commerce which is among the several States, or with foreign nations. Where the subject-matter of the agreement does not directly relate to and act upon and embrace interstate commerce, and where the undisputed facts clearly show that the purpose of the agreement was not to regulate, obstruct or restrain that commerce, but that it was entered into with the object of properly and fairly regulating the transaction of the business in which the parties to the agreement were engaged, such agreement will be upheld as

not within the statute, where it can be seen that the character
and terms of the agreement are well calculated to attain the
purpose for which it was formed, and where the effect of its
formation and enforcement upon interstate trade or commerce
is in any event but indirect and incidental, and not its purpose
or object. As is said in *Smith* v. *Alabama,* 124 U. S. 465,
473: "There are many cases, however, where the acknowl-
edged powers of a State may be exerted and applied in such a
manner as to affect foreign or interstate commerce without
being intended to operate as commercial regulations." The
same is true as to certain kinds of agreements entered into
between persons engaged in the same business for the direct
and *bona fide* purpose of properly and reasonably regulating
the conduct of their business among themselves and with the
public. If an agreement of that nature, while apt and proper
for the purpose thus intended, should possibly, though only
indirectly and unintentionally, affect interstate trade or com-
merce, in that event we think the agreement would be good.
Otherwise, there is scarcely any agreement among men which
has interstate or foreign commerce for its subject that may not
remotely be said to, in some obscure way, affect that commerce
and to be therefore void. We think, within the plain and
obvious construction to be placed upon the act, and following
the rules in this regard already laid down in the cases hereto-
fore decided in this court, we must hold the agreement under
consideration in this suit to be valid.

From very early times it has been the custom for men
engaged in the occupation of buying and selling articles of a
similar nature at any particular place to associate themselves
together. The object of the association has in many cases
been to provide for the ready transaction of the business of
the associates by obtaining a general headquarters for its
conduct, and thus to ensure a quick and certain market for
the sale or purchase of the article dealt in. Another purpose
has been to provide a standard of business integrity among
the members by adopting rules for just and fair dealing
among them and enforcing the same by penalties for their
violation. The agreements have been voluntary, and the

penalties have been enforced under the supervision and by members of the association. The preamble adopted by the association in this case shows the ostensible purpose of its formation. It was not formed for pecuniary profits, and a careful perusal of the whole agreement fails, as we think, to show that its purpose was other than as stated in the preamble. In other words, we think that the rules adopted do not contradict the expressed purpose of the preamble, and that the result naturally to be expected from an enforcement of the rules would not directly, if at all, affect interstate trade or commerce. The agreement now under discussion differs radically from those of *United States* v. *Jellico Mountain Coal & Coke Co.*, 46 Fed. Rep. 432; *United States* v. *Coal Dealers Association of California*, 85 Fed. Rep. 252, and *United States* v. *Addyston Pipe & Steel Co.*, 85 Fed. Rep. 271. The agreement in all of these cases provided for fixing the prices of the articles dealt in by the different companies, being in one case iron pipe for gas, water, sewer and other purposes, and coal in the other two cases. If it were conceded that these cases were well decided, they differ so materially and radically in their nature and purpose from the case under consideration, that they form no basis for its decision. This association does not meddle with prices and itself does no business. In refusing to recognize any yard trader who is not a member of the exchange, we see no purpose of thereby affecting or in any manner restraining interstate commerce, which, if affected at all, can only be in a very indirect and remote manner. The rule has no direct tendency to diminish or in any way impede or restrain interstate commerce in the cattle dealt in by defendants. There is no tendency as a result of the rule, directly or indirectly, to restrict the competition among defendants for the class of cattle dealt in by them. Those who are selling the cattle have the market composed of defendants, and also composed of the representative buyers of all the packing houses at Kansas City, and also of the various commission merchants who are constantly buying on orders and of those who are buying on their own account. This makes a large competition wholly outside of the defendants. The owner of

cattle for sale is, therefore, furnished with a market at which the competition of buyers has a broad effect. All yard traders have the opportunity of becoming members of the exchange, and to thus obtain all the advantages thereof.

The design of the defendants evidently is to bring all the yard traders into the association as members, so that they may become subject to its jurisdiction and be compelled by its rules and regulations to transact business in the honest and straightforward manner provided for by them. If while enforcing the rules those members who use improper methods or who fail to conduct their business transactions fairly and honestly are disciplined and expelled, and thereby the number of members is reduced, and to that extent the number of competitors limited, yet all this is done, not with the intent or purpose of affecting in the slightest degree interstate trade or commerce, and such trade or commerce can be affected thereby only most remotely and indirectly, and if, for the purpose of compelling this membership, the association refuse business relations with those commission merchants who insist upon buying from or selling to yard traders who are not members of the association, we see nothing that can be said to affect the trade or commerce in question other than in the most roundabout and indirect manner. The agreement relates to the action of the associates themselves, and it places in effect no tax upon any instrument or subject of commerce; it exacts no license from parties engaged in the commercial pursuits, and prescribes no condition in accordance with which commerce in particular articles or between particular places is required to be conducted. *Sherlock* v. *Alling*, 93 U. S. 99; *Smith* v. *Alabama*, 124 U. S. 465, 473; *Pittsburg and Southern Coal Company* v. *Louisiana*, 156 U. S. 590, 598.

If for the purpose of enlarging the membership of the exchange, and of thus procuring the transaction of their business upon a proper and fair basis by all who are engaged therein, the defendants refuse to do business with those commission men who sell to or purchase from yard traders who are not members of the exchange, the possible effect of such a course

of conduct upon interstate commerce is quite remote, not intended and too small to be taken into account.

The agreement lacks, too, every ingredient of a monopoly. Every one can become a member of the association, and the natural desire of each member to do as much business as he could would not be in the least diminished by reason of membership, while the business done would still be the individual and private business of each member, and each would be in direct and immediate competition with each and all of the other members. If all engaged in the business were to become members of the association, yet, as the association itself does no business, it can and does monopolize none. The amount and value of interstate trade is not at all directly affected by such membership; the competition among the members and with others who are seeking purchasers would be as large as it would otherwise have been, and the only result of the agreement would be that no yard traders would remain who were not members of the association. It has no tendency, so far as can be gathered from its object or from the language of its rules and regulations, to limit the extent of the demand for cattle or to limit the number of cattle marketed or to limit or reduce their price or to place any impediment or obstacle in the course of the commercial stream which flows into the Kansas City cattle market. While in case all the yard traders are not induced to become members of the association, and those who are such members refuse to recognize the others in business, we can see no such direct, necessary or natural connection between that fact and the restraint of interstate commerce as to render the agreement not to recognize them void for that reason. A claim that such refusal may thereby lessen the number of active traders on the market, and thus possibly reduce the demand for and the prices of the cattle there set up for sale, and so affect interstate trade, is entirely too remote and fanciful to be accepted as valid.

This case is unlike that of *Hopkins* v. *Oxley Stave Company,* 83 Fed. Rep. 912, to which our attention has been called. The case cited was decided without reference to the act of Con-

gress upon which alone the case at bar is prosecuted, and the agreement was held void at common law as a conspiracy to wrongfully deprive the plaintiff of its right to manage its business according to the dictates of its own judgment. It was also said that the fact could not be overlooked that another object of the conspiracy was to deprive the public at large of the benefits to be derived from a labor-saving machine which seemed to the court to be one of great utility. No question as to interstate commerce arose and none was decided.

From what has already been said regarding rule 10, it would seem to follow that the other rules (11, 12 and 13) are of equal validity as rule 10, and for the same reasons. The rules are evidently of a character to enforce the purpose and object of the exchange as set forth in the preamble, and we think that for such purpose they are reasonable and fair. They can possibly affect interstate trade or commerce in but a remote way, and are not void as violations of the act of Congress.

*We are of opinion therefore that the order in this case should be reversed and the case remanded to the Circuit Court of the United States for the Western Division of the Western District of Missouri with directions to dismiss the complainants' bill with costs.*

MR. JUSTICE HARLAN dissented.

MR. JUSTICE McKENNA took no part in the decision of this case.