## UNITED STATES v. FUR DRESSERS' & FUR DYERS' ASS'N, Inc., et al.

(District Court, S. D. New York. May 2, 1925.)

**1. Monopolies ⬌12(1)—Suppression of competition or restraint of trade to render agreement or combination illegal must be unreasonable.**

An agreement is not illegal under the antitrust laws (Comp. St. § 8820 et seq.) merely because it suppresses competition or restrains trade, but suppression of competition or restraint of trade, to make agreements and combinations illegal, must be unreasonable.

**2. Monopolies ⬌14—Anti-Trust Act held inapplicable to association of fur dressers and fur dyers; "trade or commerce."**

Anti-Trust Act (Comp. St. § 8820 et seq.) *held* inapplicable to an association of fur dressers and fur dyers, who neither buy nor sell furs, since the dyeing and dressing of furs does not constitute "trade or commerce," but is only the performance of labor.

Petition by the United States against the Fur Dressers' & Fur Dyers' Ass'n, Incorporated, and others. Petition dismissed.

William Hayward, David L. L'Esperance, Jr., Rush H. Williamson, and Ryland W. Joyce, all of New York City, for the United States.

Cadwalader, Wickersham & Taft, Edwin P. Grosvenor, and Herbert A. Koenig, all of New York City, for defendants.

BONDY, District Judge. The petitioner alleges that the defendants are engaged in a conspiracy to restrain and monpolize interstate trade in fur skins, in violation of the anti-trust laws (Comp. St. § 8820 et seq.), and prays that the defendants be enjoined from restraining trade, and from putting into effect the rules and regulations of the Fur Dressers' & Fur Dyers' Association, Inc., and that they be ordered to dissolve that association.

The defendants deny that any of their acts constitute a violation of the anti-trust laws, and allege that the constitution, by-laws, rules, and regulations of the Fur Dressers' & Fur Dyers' Association, Inc., are the rules of a legitimate credit association, conducted for the purpose of enabling the defendants to have available for their use information in regard to the credit of their customers, and to protect the defendants from losses arising out of the numerous insolvencies in the fur trade; that defendants have carried on their businesses at all times in competition with each other; that the defendants only render services, and are not engaged in interstate commerce; that the regulations of the association have no relation, direct or indirect, to interstate commerce; and that the observance thereof by the members does not constitute an unlawful conspiracy in restraint of commerce.

It has been stipulated that the fur dresser takes the raw skin, scrapes off the meat, and in many cases dyes the fur; that the defendants, other than the Fur Dressers' & Fur Dyers' Association, Inc., are fur dressers and dyers, and are paid by fur merchants and manufacturers for services rendered in the dressing and dyeing of skins; that the defendants do not deal in fur skins; that the fur dresser and dyer as a rule has only a small capital investment in his business; that his capital is principally technical knowledge of a process for dyeing skins a particular color; that about 80 per cent. of the expense of the business of the dresser and dyer consists of labor which must be paid every Saturday night; that there are in the United States about 10,000 fur merchants, manufacturers, and dealers, nearly all of whom are customers of fur dressers and dyers; that there are approximately 150 fur dressers and dyers, of whom 30 are members of the Fur Dressers' & Fur Dyers' Association, Inc.; that fur merchants, manufacturers, and dealers ship raw furs and furs which have been dressed and dyed to all points in the United States; that all the defendants are members of the Fur Dressers' & Fur Dyers' Association, Inc.; that membership is limited to those actually engaged in the dressing and/or dyeing of fur skins; that the members of the association do about 70 per cent. of all the business of dressing and dyeing fur skins in the United States, excluding the dressing and dyeing of rabbit skins, which constitutes an enormous business; and that, therefore, if rabbit skins are taken into consideration, the defendants do very much less than 70 per cent. of the total business of dressing and dyeing skins.

It also has been stipulated that the defendants always have carried on and now are carrying on their businesses in competition with each other as to charges for dressing

and dyeing skins, and that the charges made and collected by the various defendants for dressing and dyeing skins have at all times differed by reason of such competition. It also has been stipulated that the provisions of the constitution, by-laws, rules, and regulations of the association, which the government maintains are illegal, are those providing that each member shall deposit with the association the sum of $500 to secure the faithful performance of the by-laws, rules, and regulations of the association; that any member who shall willfully violate any article of the constitution or any of the rules or regulations of the association shall be subject to a fine; that no member of the association shall allow any of its customers any discounts; that all bills shall be rendered net, payable at the end of the month next following the month of delivery; and that lists of persons who have failed to pay their overdue accounts to members of the association shall be prepared and distributed to the members each month for their information and use, and that no delivery of dressed or dyed skins shall be made to any person by any member of the association so long as the name of that person appears upon the said list, except upon payment by cash or by check upon delivery of the skins.

The rules of the association provide every conceivable method to prevent the listing of customers other than those who have failed to pay their bills, and every conceivable method for the immediate release of every customer from the list upon the payment of his bills. Only the names of customers who have not paid their accounts are listed, not the names of the members, nor the amounts that the customers owe the members, nor the names of customers who owe less than $100, or who honestly dispute unpaid accounts.

Information as to financial responsibility of customers and the lien which the law gives are not sufficient to protect the dressers or dyers, about 80 per cent. of whose expenses is labor that must be paid every Saturday night. There were 1,080 insolvencies in New York City in the fur trade during the years 1911 to 1923 among fur manufacturers and dealers with whom the defendants do business, with losses to creditors amounting to many million dollars. It became the general practice of customers of the dressers to make unwarranted and dishonest claims, and to pay only when it pleased them to do so. Many customers would get credit from one defendant after another, and then would not pay their bills for almost a year, and then would insist on a cash discount of 5 per cent.,

besides another 15 or 20 per cent. on account of unfair claims, with the result that the fur dressers and dyers did not get half of what was due them.

The bills for dressing and dyeing average between $20 and $25 each. In many cases the collection of the claims would have cost more than the amount of the claims. The dressers and dyers are interested in knowing whether a customer pays his bills in full when due, in accordance with his promises, or whether he makes unwarranted claims, not whether he is rich or poor. Their chief concern is that their bills should be paid in full when due, not whether by the foreclosure of a lien or through prolonged litigation they may ultimately recover the agreed price for their services.

That fur dealers have not been subjected to hardship is established by the great growth of the fur business during the 10 years last past. The number of fur merchants, dealers, manufacturers, retailers, and furriers in New York City was 1,201 in 1915, and 3,199 in 1923. The transactions increased from 34,484, amounting to $1,484,416.64, in 1915, to 101,398, amounting to $10,849,239.64, in 1923, and New York City has become the largest fur dyeing and dressing center in the world. Although the association has been operating nine years, the government has not proved, or even attempted to prove, any injury to any one.

Before its adoption in 1915, the plan was submitted to the fur merchants and manufacturers that were members of the Board of Trade of the Fur Industry, and was approved by them. Reputable dealers were competing at a disadvantage with those who were not paying their dressing and dyeing charges when due, nor in full.

The provisions that lists of customers who have failed to pay their overdue accounts to members of the association shall be distributed to members of the association for their information, and that no delivery of dressed or dyed skins shall be made to any person by any member so long as the name of that person appears upon the list, except upon payment of cash or by check upon the delivery of skins, do not go beyond the reasonable requirement to correct the abuses which have crept into the trade. The provisions discriminate against none other than those who do not pay agreed prices for services rendered to them.

Compliance with the rules does not require any member to dress or dye furs for cash only, nor does it limit the amount of credit which a member may extend to a customer

who meets his obligations, nor does it prevent any member from dressing or dyeing furs for a customer who has failed to pay his bills and whose name is on the unpaid account list. The rules only require that the dressing and dyeing for customers who have failed to pay their bills should be done for cash. Every delinquent can have his dyeing and dressing done, provided he pays cash, or pays his bills, and so re-establishes his credit, or takes his skins to any one of the 120 dressers and dyers who are not among the 30 members of the association.

The regulation that bills shall be rendered net, payable at the end of the month next following the month of delivery, provides for uniformity in the customs and usages of the trade, and, as has been conceded by the government, without in any manner affecting competition as to price. It is a reasonable requirement, to enable the members to determine whether a customer pays his bills upon the expiration of a reasonable and uniform credit.

The regulation that no member shall allow any customer any discounts refers only to unwarranted deductions from prices expressly agreed upon when the skins are received for dressing and dyeing, and, as is conceded by the government, arrived at in competition. This also is a reasonable requirement, to enable members to determine whether a customer pays his obligations without any unjust demands for deductions.

This provision does not prevent a member from making proper allowances, as, for instance, for damages to furs, or shortages in delivery, or other proper claims. The rules themselves provide that a copy of all credits and allowances made by members must be filed with the association. They also provide for the arbitration of disputed claims for credits and allowances, and that all claims must be made within five days after delivery. As a matter of fact, claims amounting to $4,672,555.63 have been allowed by members between the years 1915 and 1923.

The provision that each member shall deposit with the association the sum of .$500 to secure the faithful performance of the by-laws, rules, and regulations of the association is reasonable. The by-laws provide that for the expense of operating the association a tax of 1 per cent. is assessed on the gross amount of business done during the year, and that, if any deficiency occurs, it shall be assessed pro rata upon the members. The reasonableness of the provision is demonstrated by the fact that nine members who were admitted without making a deposit re-

signed while owing in the aggregate $6,-850.64 as their share of office expenses. If they had been required to comply with the by-laws, and to make a deposit of $500 each, the loss would have been reduced at least $4,500.

The provision that any member who shall willfully violate any article of the constitution, or any rule or regulation of the association, shall be subject to a fine, suspension, or expulsion, is not unlawful.

The rules provide that any member absenting himself from two regular meetings will be fined $5 for each nonattendance. They provide that the amount of the fine shall not exceed $250 in any case. In no event do these provisions operate to coerce any member to do anything. The rules provide that a member may resign at any time, and on resignation is entitled to a return of his proportionate share of his guaranty, with accrued interest, provided no charges are pending against him and no dues are outstanding and unpaid.

[1] Notwithstanding that there have been 16,021 deliveries on open account to listed concerns in violation of the rules during three years and seven months, no fines have been imposed for any violation, except a fine of $10 to secure attendance at meetings, and a fine which was subsequently remitted.

Not every agreement which suppresses competition or restrains trade is illegal. Only such agreements and combinations as unreasonably suppress competition or restrain trade are illegal. Chicago Board of Trade v. United States, 246 U. S. 231, 38 S. Ct. 242, 62 L. Ed. 683; National Association of Window Glass Manufacturers v. United States, 263 U. S. 403, 44 S. Ct. 148, 68 L. Ed. 358; Standard Oil Co. v. United States, 221 U. S. 1, 66, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; Moore v. New York Cotton Exchange (C. C. A.) 296 F. 61. Only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade." Nash v. United States, 229 U. S. 373, 376, 33 S. Ct. 780, 781, 57 L. Ed. 1232.

In Chicago Board of Trade v. United States, 246 U. S. 231, 238, 38 S. Ct. 242, 244, 62 L. Ed. 683, the Supreme Court said: "The case was rested upon the bald proposition, that a rule or agreement by which men occupying positions of strength in any branch of trade, fixed prices at which they would buy or sell during an important part

of the business day, is an illegal restraint of trade under the Anti-Trust Law. But the legality of an agreement or regulation can not be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates, and perhaps thereby promotes, competition, or whether it is such as may suppress, or even destroy, competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation, or the reverse, but because knowledge of intent may help the court to interpret facts and to predict consequences."

"Persons have a right to associate for the purpose of advancing their own interests, by discriminating against other persons, if such discrimination is based upon proper and legal grounds, e. g., failure to pay bills due to members of the association (Brewster v. Miller, 101 Ky. 368, 41 S. W. 301, 38 L. R. A. 505), and is not merely coercive and arbitrary, as in Martell v. White, 185 Mass. 255, 69 N. E. 1085, 64 L. R. A. 260, 102 Am. St. Rep. 341, nor for the purpose of restraining interstate trade, as in Eastern States Lumber Association v. U. S., 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788." United States v. King (D. C.) 229 F. 275; Woodhouse v. Powles, 43 Wash. 617, 621, 86 P. 1063, 8 L. R. A. (N. S.) 783, 117 Am. St. Rep. 1079; Putnal v. Inman, 76 Fla. 553, 80 So. 316, 3 A. L. R. 1580; Delz v. Winfree, Norman & Pearson, 6 Tex. Civ. App. 11, 25 S. W. 50.

[2] The defendants neither buy nor sell furs. They only dress and dye furs belonging to others at their places of business. Dyeing and dressing furs do not constitute trade or commerce, but only the performance of labor. The rules and regulations of the association, and the agreement of its members to observe the same, if they restrain trade and commerce, therefore do so only indirectly and remotely, and do not come within the provisions of the Anti-Trust Act. "An agreement entered into for the purpose of promoting the legitimate business of an individual or corporation, with no purpose to thereby affect or restrain interstate commerce, and which does not directly restrain such commerce, is not, as we think, covered by the act, although the agreement may indirectly and remotely affect that commerce." United States v. Joint-Traffic Ass'n, 171 U. S. 505, 568, 19 S. Ct. 25, 31, 43 L. Ed. 259. See also Industrial Ass'n of San Francisco v. United States, 45 S. Ct. 403, 69 L. Ed. ——, decided by United States Supreme Court April 13, 1925; Federal Club v. National League, 259 U. S. 200, 42 S. Ct. 465, 66 L. Ed. 898, 26 A. L. R. 357; Blumenstock Bros. v. Curtis Pub. Co., 252 U. S. 436, 40 S. Ct. 385, 64 L. Ed. 649; Oliver Iron Mining Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 67 L. Ed. 929; United Mine Workers v. Coronado Co., 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; United Leather Workers v. Herkert, 265 U. S. 457, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566.

In Anderson v. United States, 171 U. S. 604, 615, 19 S. Ct. 50, 54, 43 L. Ed. 300, the Supreme Court said: "Where the subject-matter of the agreement does not directly relate to and act upon and embrace interstate commerce, and where the undisputed facts clearly show that the purpose of the agreement was not to regulate, obstruct, or restrain that commerce, but that it was entered into with the object of properly and fairly regulating the transaction of the business in which the parties to the agreement were engaged, such agreement will be upheld as not within the statute, where it can be seen that the character and terms of the agreement are well calculated to attain the purpose for which it was formed, and where the effect of its formation and enforcement upon interstate trade or commerce is in any event but indirect and incidental, and not its purpose or object." And again: "The same is true as to certain kinds of agreements entered into between persons engaged in the same business, for the direct and bona fide purpose of properly and reasonably regulating the conduct of their business among themselves and with the public. If an agreement of that nature, while apt and proper for the purpose thus intended, should possibly, though only indirectly and unintentionally, affect interstate trade or commerce, in that event we think the agreement would be good."

In United Leather Workers v. Herkert, 265 U. S. 457, 471, 44 S. Ct. 623, 627, 68 L. Ed. 1104, 33 A. L. R. 566, the Supreme Court said: "This review of the cases makes it clear that the mere reduction in the supply of an article to be shipped in interstate

commerce, by the illegal or tortious prevention of its manufacture, is ordinarily an indirect and remote obstruction to that commerce. It is only when the intent or necessary effect upon such commerce in the article is to enable those preventing the manufacture to monopolize the supply, control its price, or discriminate as between its would-be purchasers, that the unlawful interference with its manufacture can be said directly to burden interstate commerce."

By-laws of an association, which provide that members thereof who violate its rules or regulations shall be fined or expelled, are not unlawful. Industrial Association of San Francisco v. United States, supra; Anderson v. United States, 171 U. S. 604, 618, 19 S. Ct. 50, 43 L. Ed. 300.

The government did not prove that the rules of the association or compliance therewith by its members in any manner directly or unduly affected interstate commerce, nor that the defendants intended to restrain, or in fact did restrain, interstate commerce. The defendants did nothing that involved interstate commerce. They created no monopoly. They fixed no prices. The association simply regulated business of its members in a way tending to promote, rather than restrain, legitimate trade. Nothing that the association did or could do under its by-laws was injurious to any of its members or the public. No one, except a person looking for an unfair or dishonest advantage, could object to its regulations.

The petition, therefore, must be dismissed.