**UNITED STATES of America,**
**Petitioner,**

v.

**ASSOCIATED CREDIT BUREAUS, INC.,**
**et al., Respondents.**

**No. 71 C 716(A).**

United States District Court,
E. D. Missouri,
Eastern Division.

July 14, 1972.

Daniel P. Bartlett, Jr., U. S. Atty., David W. Harlan, Asst. U. S. Atty., St. Louis, Mo., for petitioner.

Michael C. Walther, Lashly, Caruthers, Rava, Hyndman & Rutherford, St. Louis, Mo., for respondents.

## MEMORANDUM OPINION

HARPER, District Judge.

On June 12, 1933, the government filed with this Court Equity Action No. 10420 charging the National Retail Credit Association, predecessor of Associated Credit Bureaus, Inc. (hereinafter referred to as ACB), one of the respondents in the present action, with violation of the Sherman Act (15 U.S.C. §§ 1–7). Final decree was entered in this Court in Equity Action No. 10420 on October 6, 1933. ACB, as successor to the National Retail Credit Association, is a party to the 1933 decree.

On October 19, 1953, this Court entered a consent order which modifies the 1933 decree in several respects. The 1953 order stated that the provisions of the 1933 decree that were not amended remained in full force and effect.

On October 12, 1971, ACB filed with this Court a motion in Action No. 10420 for interpretation or modification of the consent decree of 1933, as amended in 1953. On November 15, 1971, the government filed a memorandum of points and authorities in opposition to the motion of ACB. The following day, November 16, 1971, the government filed civil action 71 C 716(A), a civil contempt petition with respect to ACB and a number of individual respondents (officers and directors of ACB named therein). By agreement of the parties the trial of the civil contempt action and the hearing on ACB's motion were heard together. This memorandum opinion will deal only with the civil contempt petition. The motion of ACB will be dealt with separately.

The pleadings and the testimony applicable to this proceeding disclose that ACB is a non-profit organization. It is the primary trade association of credit bureaus throughout the country and has approximately twenty-two hundred bureaus in its membership. These credit bureaus are engaged in the gathering, recording and dissemination of information relating to the credit worth, financial responsibility or paying habits of consumer purchasers or proposed consumer purchasers of goods or services on credit.

ACB, through its Credit Reporting Division, offers credit bureaus a means through which credit reports may be conveniently exchanged between credit bureaus. The means which the Credit Reporting Division provides is an inter-bureau coupon system which requires the use of standard ACB reporting forms. ACB has offered this service

and used this system since its inception in 1906. ACB furnishes and requires the use of different types of standard ACB reporting forms to its members. For every different type of reporting form there is a corresponding coupon. The ACB member bureaus purchase the coupons, each type having a different price. When an ACB member desires credit information from another member it sends that member a coupon corresponding to the type of report it wishes to receive. The member that receives the coupon in payment for the report it furnishes then sends the coupon to ACB which redeems the coupon. The redemption value of a coupon is less than the original cost of the coupon. The difference between the two prices has varied at different times in ACB's history. The money which ACB retains because of the difference of the two prices is used to pay the expenses incurred in running the interbureau reporting program and to provide other services for the ACB members, thus reducing and acting as a partial substitute for dues.

This controversy arose because of a conflict between ACB and Credit Bureau Reports, Inc. (hereinafter referred to as CBR). CBR is a for-profit organization. Until recently, CBR had functioned solely as a national sales organization. CBR obtained credit reports from local credit bureaus, including members of ACB, and used them to provide credit information to large credit grantors such as oil companies. Thus, the large credit grantors could obtain credit information from a single source rather than having to deal with hundreds of local credit bureaus. ACB decided to establish a subsidiary corporation, Credit Services International, that would compete with CBR as a national credit sales organization. In response, CBR decided to go into interbureau reporting. This decision was made around July of 1970, but the program was not presented to and approved by CBR's board of directors until July 27, 1971. CBR's interbureau reporting system is similar to ACB's except that the forms used are different and CBR's order tickets, unlike ACB's coupons, are not prepaid. CBR furnishes bureaus with order tickets. A bureau which orders a credit report sends an order ticket to a bureau which it wishes to prepare the credit report. The preparing bureau then sends the order ticket to CBR which pays the preparing bureau and then bills the ordering bureau a somewhat larger amount.

CBR sent letters to approximately two thousand bureaus to obtain members for their interbureau reporting service. Of these two thousand bureaus approximately nineteen hundred were ACB members. Upon learning that CBR planned to get ACB members to use CBR reporting forms and order tickets, ACB reminded its members that the Credit Reporting Division's membership agreement and ACB's interbureau reporting rule required that the ACB member bureaus use ACB coupons when dealing with other members of ACB. ACB also reminded its members that ACB credit bureaus are prohibited from charging reputable non-member credit bureaus prices higher than they charge other member bureaus if payment is in cash. In other words, if CBR forms were used by member bureaus these bureaus could not charge non-member bureaus a higher price for the same service without violating the 1953 order.

The ACB provisions with respect to the coupons have been virtually unchanged since 1906. The Credit Reporting Division membership agreement (Ex. 3) states in part:

"THE CREDIT REPORTING DIVISION MEMBER AGREES:

\*  \*  \*  \*  \*  \*

"3. To purchase and use official ACB interbureau coupons in payment for all reports requested from ACB bureaus and to prepare the reports on ACB standard reporting forms in accordance with the Interbureau Reporting Rules."

The Interbureau Reporting Rules (Ex. 2) state in part:

## "RULE ONE. COMPLIANCE WITH INTER-BUREAU REPORTING RULES.

"A. All members of the Credit Reporting Division shall be required to comply with all policies, procedures, rules and ethics of the Association presently in effect or subsequently adopted by the Board of Directors, including but not limited to all provisions contained in the Membership Agreement * * *.

"B. * * *

"C. * * *

"D. Any member credit bureau which is found guilty of a confirmed violation of the Inter-Bureau Reporting Rules may be deprived of the right to purchase and use ACB interbureau coupons and may be subject to cancellation from membership in the Credit Reporting Division of ACB.

## "RULE THREE. SUGGESTED MINIMUM CASH PRICES.

"A. Inter-bureau coupons are for prepayment of inter-bureau reports and in every instance, the inquiring bureau will accompany its request with the proper coupon or coupons. * * * *"

Article IX, Section 5 of the Constitution and ByLaws of ACB (Ex. 1) provides a means for enforcing the interbureau reporting rules:

"Section 5. A member is subject to immediate and final cancellation of membership in the Association by the Executive Committee without the filing of a formal complaint if:

* * * * * *

"D. A member continues to violate Association Rules after written notice."

The section of the membership agreement quoted above which is incorporated into the interbureau reporting rules by Rule One (A), Rule One (D), and the portion of Rule Three (A) and Article IX, Section 5 of the Constitution and Bylaws of ACB, quoted above, will, for the purposes of this opinion, be referred to as the "coupon rules".

The "coupon rules" facilitate the effective supervision of quality control in credit reporting between ACB members and contribute to the efficiency and effectiveness of interbureau reporting between the members. The "coupon rules" assure that only standard ACB reporting forms will be requested of other ACB member bureaus. Therefore, only the standard ACB reporting forms will be used in reply and, thus, ACB is able to control the exactness and reliability of the interbureau reporting between its members. No material change has occurred in the character or operation of the interbureau coupon system or the "coupon rules" since the establishment of ACB's parent organization in 1906.

The government in its petition alleges that respondents have violated and are continuing to violate Section II and part of Section III of the 1933 decree of this court, sections that still remained in full force and effect after the 1953 order, and have thereby acted and are continuing to act in contempt of the authority of this Court.

Section II of the 1933 decree provides:

"That the defendants and each of them, individually and collectively, their successors, members, officers, directors, managers, agents, servants, employees and all persons acting or claiming to act, under or in behalf of them, or any of them, be and they hereby are permanently and perpetually enjoined and restrained from in any way maintaining, continuing, or reviving, either directly or indirectly, in whole or in part by any means whatsoever, the combination, conspiracy and monopolization of trade and commerce in credit reports and credit information described in the petition herein, or any combination, conspiracy, or monopolization similar thereto,

as more particularly set out in paragraph three immediately following."

Section III of the decree provides in part:

"That the defendants * * * are, permanently and perpetually enjoined or restrained from

"(1) Designating and assigning any region or regions as the exclusive territory in which any member or members of the Association shall gather credit information or sell credit information or reports.

"(2) Refraining from gathering credit information or selling credit information or reports in any region or regions assigned as the exclusive territory of any member or members of the Association.

"(3) Refusing to sell credit information or reports to vendees in any region or regions assigned as the exclusive territory of any member or members of the association except to and through a member or members of the Association.

"(4) Reporting, circulating, or in any manner publishing the names of persons or corporations who have sought, or are seeking, to procure, buy, or sell credit information or credit reports from or to any member or members of the Association except to and through a member or members thereof * * *."

The portion of Section III which the government alleges ACB violated follows and states:

"Nothing herein shall be construed to preclude the members of the Association from individually using any available organization, or individual, or other source of credit information in any region or place."

This Court has jurisdiction over the present action as provided in Section VI of the 1933 consent decree, which states:

"That jurisdiction of this cause is hereby retained for the purposes of enforcing this decree, or enabling the parties to apply to the court for modification or enlargement of its provisions on the ground that they are inadequate or have become inappropriate or unnecessary."

The government in its petition alleged: (1) ACB requires, as a condition of membership in its Credit Bureau Division, that credit bureaus use only ACB interbureau coupons as a medium of exchange in payment for credit reports obtained from other ACB member bureaus and the use of any other medium of exchange between member bureaus is forbidden under penalty of cancellation of the bureau's ACB membership; (2) written warnings to this effect were sent by ACB to its credit bureau members; (3) ACB representatives warned bureau members at the ACB state meetings that violation of the coupon rules would result in cancellation of the ACB membership; and (4) ACB officers, directors and representatives implied that the 1953 order of this Court prohibited member-bureaus from using mediums of exchange provided by credit organizations other than ACB.

ACB does not deny the first three allegations. It contends, however, that the use and enforcement of the "coupon rules" does not violate the 1933 decree. In regard to the fourth allegation, the Court found evidence of only one incident where an ACB representative implied that the enforcement of the "coupon rules" were required by the 1953 order. This implication was made in one sentence spoken by a regional vice president of ACB at ACB's state meeting in Wyoming. There were approximately fifty ACB state meetings at which the "coupon rules" were one of the main topics of discussion. Considering this and the fact that letters concerning the "coupon rules" were sent to all member bureaus, the Court cannot imagine that the one isolated statement would have had any significant effect on the member bureaus. The Court holds that even if the statement were possibly a violation of the 1933 decree it would come under the "de minimus" doctrine.

The Court will consider in detail only the first three allegations of the government.

■ This case does not involve the question of whether the actions of ACB are illegal under the antitrust laws. If the government had wished to test that proposition, it could have brought an action under Section 1 of the Sherman Act (15 U.S.C. § 1). It sought instead to have the Court find respondents in contempt of Sections II and a part of III of the 1933 decree and enjoin them from requiring the use of ACB interbureau coupons. Thus, the case presents only the narrow question of whether this requirement is a violation of Sections II and a part of III of the 1933 decree. The Court finds that it is not.

The government in its post-trial brief characterizes the 1933 decree as being framed in broad language intended to prohibit any attempt to revive or establish a monopoly in any area of credit reports and information. The Court does not agree with that characterization. The 1933 decree only prohibits certain specific activities of ACB and all actions similar to these specific activities. If the interpretation which the government gives the 1933 decree were correct the decree would not be in conformance with the decision of the Supreme Court in Hartford-Empire Co. v. United States, 323 U.S. 386, 410, 65 S.Ct. 373, 385, 89 L.Ed. 322, which states:

"The decree must not be 'so vague as to put the whole conduct of the defendants' business at the peril of summons for contempt'; enjoin 'all possible breaches of the law' (citation omitted); or 'cause the defendants hereafter not to be under the protection of the law of the land.' (citations omitted)"

The 1933 decree dealt with and prohibited arrangements whereby regions were assigned as the exclusive territory of a member of the association and all other bureaus, both members and non-members, were restricted from gathering or selling credit information in those regions except through and to the member to whom that region was assigned. Section II of the 1933 decree prohibited this type of monopolization of trade and commerce in credit reports and information "or any combination, conspiracy or monopolization similar thereto." ACB, by requiring its members to use coupons and specified forms when they request reports from each other, is not engaging in any action "similar thereto". The type of activity is different, the effect of the activity is different, and the type of organization affected is different. The conduct which the 1933 decree directly prohibited was that non-member bureaus were prevented from obtaining credit information except through member bureaus or receiving any requests for credit information from member bureaus. The conduct which the 1933 decree directly prohibited restrained trade between member and non-member bureaus. The "coupon rules" do not restrict non-member bureaus from getting or receiving requests for credit information from member bureaus. The "coupon rules" simply assure the uniform use of standard ACB credit reporting forms between the members of ACB. The only types of organizations affected by the "coupon rules" are those seeking to induce ACB members to use between themselves coupon systems and reporting forms different from those ACB uses. Non-member bureaus are not affected. Therefore, since any restriction of trade that results from the "coupon rules" is not similar to the restrictions directly prohibited by the 1933 decree, they are not prohibited by that decree.

The government interprets the portion of Section III of the 1933 decree which it alleges ACB has violated as prohibiting ACB from promulgating any rule which restricts its members from using the services of any other credit organization. This paragraph does not prohibit ACB from doing anything. It simply sets out that nothing in the 1933 decree precludes ACB members from using any available source of credit information.

The paragraph is an explanation, not a command.

Even if the paragraph were interpreted by the Court as defining acts which ACB was enjoined from committing, ACB has done nothing which would be in violation of the paragraph. If the paragraph defined acts which ACB was enjoined from committing, ACB could not have any rule which prohibited members from using any source of credit information. The "coupon rules" do not restrain members from using any source of credit information. They only insure the use of particular forms when credit information is obtained from other ACB members. It does not prohibit the members from using other organizations as sources of credit information.

If the 1933 decree were equally susceptible to the interpretations the government is now urging, the Court would not accept those interpretations. ACB's "coupon rules" have been in existence since the establishment of ACB's parent organization in 1906 and the wording of those rules has not been substantially changed since that time. The consent order of 1953 refers to the use of interbureau coupons. The government has continually worked closely with ACB and has relied on ACB to keep its members in compliance with the 1933 decree and the 1953 order. ACB used the "coupon rules" in 1950 to prevent its California member-bureaus from using mediums of exchange other than ACB coupons. The government contends in its brief that while the "coupon rules" had been in existence for an extended period of time it had never acquiesced in the use which ACB has recently made of the "coupon rules". That use is simply the enforcement of the rules. Even if the government had never acquiesced in the enforcement of the rules this does not mean that the government has not acquiesced in the rules themselves. Section III of the 1933 decree provides in part:

> "That the defendants shall forthwith abrogate and cancel all by-laws, rules, regulations, conditions, contracts, provisions or resolutions which suggest, authorize, encourage, permit or direct any of the acts and things hereinabove specifically enjoined * * *."

If the government believed in 1933 that the "coupon rules" violated the 1933 decree they had an obligation to enforce the cancellation of those "coupon rules". The fact that they did not must be considered an acquiescence in those rules.

The situation in this case is almost identical to the situation in United States v. Atlantic Refining Company, 360 U.S. 19, 23–24, 79 S.Ct. 944, 946–947, 3 L.Ed.2d 1054, where the Supreme Court stated:

> "We merely hold that where the language of a consent decree in its normal meaning supports an interpretation; where that interpretation has been adhered to over many years by all the parties, including those government officials who drew up and administered the decree from the start (citation omitted); and where the trial court concludes that this interpretation is in fact the one the parties intended, we will not reject it simply because another reading might seem more consistent with the Government's reasons for entering into the agreement in the first place."

This Court does not find that the government's interpretation of the 1933 decree is more consistent with the government's reason for entering into the agreement in the first place. The Court does, however, hold that the government's interpretation of the decree is erroneous and that the "coupon rules" of ACB and the enforcement of those rules do not violate the 1933 decree.

█ The government in its prayer for relief not only requests that ACB be found in civil contempt but also requests the Court to issue an order that ACB notify its members that they may use the services of any other credit reporting organization and that membership in ACB will not be cancelled because of such use. Such an order would not only prohibit ACB from requiring the use of coupons between ACB members, but

947

would also prohibit ACB from proscribing the type of forms that ACB members could use between themselves. Such an order would completely destroy any uniformity in credit reporting between ACB members, drastically inhibit any effective quality control on the part of ACB, and could result in the unreliability of credit reports. The Court does not believe that even if ACB had violated the 1933 decree the scope of such an order would be justified, since it is well established that associations have the right to enact reasonable regulations governing the trade practices of its member-competitors. Anderson v. United States, 171 U.S. 604, 19 S.Ct. 50, 43 L.Ed. 300 (1898); Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); Florists' Nationwide Telephone Delivery Network v. Florists' Telegraph Delivery Association, 371 F.2d 263 (7th Cir.) cert. denied 387 U.S. 909, 87 S.Ct. 1686, 18 L.Ed.2d 627 (1967).

This memorandum opinion is adopted by the Court as its findings of fact and conclusions of law, and the clerk is directed to prepare and enter the proper judgment in favor of the respondents.