## APEX HOSIERY CO. v. LEADER et al.
### No. 6479.

Circuit Court of Appeals, Third Circuit.

June 21, 1937.

Sylvan H. Hirsch, Arno P. Mowitz, Harry G. Sundheim and Stanley Folz, all of Philadelphia, Pa. (Mowitz & Kohlhas and Sundheim, Folz and Sundheim, all of Philadelphia, Pa., of counsel), for appellant.

M. Herbert Syme and Benjamin R. Simons, both of Philadelphia, Pa. (Robt. von Moschzisker, of Philadephia, Pa., of counsel), for appellees.

Before BUFFINGTON and DAVIS, Circuit Judges, and DICKINSON, District Judge.

DAVIS, Circuit Judge.

This is an appeal from the District Court denying a temporary injunction to the plaintiff and dismissing its bill of complaint on the ground that interstate commerce had not been so affected as to give the federal court jurisdiction.

The plaintiff is a corporation of Pennsylvania engaged in manufacturing hosiery in Philadelphia where it employs about 2500 persons. The defendants are: The Philadelphia Branch No. 1, Local No. 706 of the American Federation of Full Fashioned Hosiery Workers; William Leader, its president; Joseph Burge, its vice president; Harry Omeig, its treasurer; and Huey Brown, its secretary.

The plaintiff has what is known as an open shop in which both union and nonunion persons may work if they so desire. Some time in April, 1937, Leader wrote a letter to the plaintiff's president, William Meyer, inclosing a proposed agreement for a closed shop, in which union men only may work; said that he expected him to sign the agreement; that he would be in touch with him shortly thereafter and would like to arrange a meeting with him and a committee in his shop where the formal signing could take place. Nothing whatever was further heard from Leader or any of the other defendants until May 6, 1937, when some time between 1 and 3 o'clock in the afternoon a crowd estimated to be between 8,000 and 10,000 appeared in front of plaintiff's factory. Plaintiff had been informed that the union had called out all of its members from the union shops in Philadelphia to make what they called a "demonstration" at his factory. All the employees, except about 60, consisting of the office and maintenance force (a large number of whom were women and girls), and some foremen, had been sent home.

The undisputed evidence, none having been offered by defendants, shows that shortly before 3 o'clock Inspector LaRue of the Philadelphia police went into the plant and told Meyer that he was a messenger boy for Leader who wanted to see him. Meyer replied that under these conditions, with thousands of "noisy" people "milling around on the outside" "hollering and shouting," he could not then see him, but was willing to see him in the office of Meyer's attorney. This the inspector reported to Leader who, standing on the front steps, cried out to the crowd: "I declare a sit-down strike in Apex Hosiery Company." Immediately a volley of bricks, stones, and pipe was thrown through the windows, breaking practically every pane of glass; the sash were broken out and some of Leader's crowd were "tossed in" through the windows; the front door was battered down, and amid "noise and yelling and crying and cursing and everything else that you can imagine" the crowd rushed in, broke down partitions, dumped out files, threw adding machines and typewriters around, and smashed up things generally. "Everything was overturned in the office, the offices were complete shambles, typewriters were broken, adding machines were wrecked, first floor mimeograph machines, everything was wrecked on the first floor." The Apex employees sought refuge in the wareroom to keep from being struck with bricks and to avoid bodily harm, but they were crowded out of there and finally forced up to the sixth floor. Meyer was struck on the shoulder with a brick and hit on the back of the head with an inkwell which caused "a tremendous swelling." He described the situation in part as follows:

"They kept on coming forward and they were hollering all kinds of threats and kept crowding me and crowding me until finally they crowded me out, pushing me and pommeled me around and pushed me out into the shop room, where I closed the door between, but that didn't seem to help, because they put their foot through the glass, broke the glass out of that door and kept on coming, until they had me backed up against the wall, and it was then I said, 'For God's sake, isn't there anybody around here who can stop this terrible situation?' and somebody said, 'Go get Bill Leader.'"

Leader immediately came in and Meyer said to him: "For goodness sake, stop this situation, this was absolutely uncalled for." Leader said he would get a committee together. After a short time he came in with several persons, their attorney shortly afterward following, and said to Meyer: "Now, what about signing this agreement?" Meyer replied: "Absolutely, under these conditions, I can't sign the agreement."

The "mob," which had taken possession of the plant, then began violently to attack plaintiff's loyal employees, so beating one that it produced a fracture of the brain or skull, a fracture of the jaw, which had to be "wired up" and still remains wired; both eyes were closed and he was black and blue from his shoulders up. He was confined to the Episcopal Hospital for three weeks. They beat another employee with fists and

a piece of pipe until he was unconscious, bruising his eyes and body, and breaking five of his ribs so that he was confined in the hospital for a considerable time. They broke two ribs of Elwood Struve, plaintiff's general manager. Others were knocked down, beaten, and kicked after they were down and otherwise injured.

While this violence was taking place and the employees were in fear of more serious injury, they were forced to sign union pledge cards, of which the following is a copy:

"Pledge Card
American Federation of Hosiery Workers
Branch No. 1
Affiliated with the C.I.O. (Committee for Industrial Organization)

I hereby accept membership in the American Federation of Hosiery Workers' Union and of my own free will authorize its representatives to act for me as a collective bargaining agency in all matters of wages, hours of employment, single machine system on leggers, union agreement, closed shop and check-off system of dues and assessments.

I pledge myself if called upon to go on a sit-down strike with other workers of the Apex Silk Hosiery Co. to bring about full recognition of our demands and the Union.

Name ——————
Address ——————
Dept. ——————
Remarks ——————
Date ——————

City ——————

Organizer ——————,"

In the midst of this situation, Leader got together a group of union men and told them that they constituted the "sit-downers"; that they would be provided with cots, food, and blankets, "the same as though they were in the army," and that they were to remain in possession until a closed shop agreement was signed. While Leader was thus addressing and organizing the "sit-downers," others brought in cots, pillows, blankets, and food for them, indicating that Leader and his followers went there not to negotiate for a closed shop, but to force Meyer to sign the proposed agreement in utter disregard of law and order.

Since May 6, 1937, the "sit-downers" have been in complete possession and control of the plaintiff's plant. They have changed all the locks on the doors and have absolutely excluded the plaintiff, its officers, agents, and employees from entering the building.

The plaintiff has about 350 delicate machines in its plant worth around $10,000 each. In order to prevent them from being ruined by rust, exposure, etc., it is necessary to have them oiled and otherwise cared for. Plaintiff sought permission several times to send in what is known as "fixers" to repair the machines, care for and keep them in condition, but Leader absolutely refused to give this permission.

There was also in the factory on the day of this calamitous advent of Leader and his followers finished merchandise for the spring trade worth about $600,000 ready to be sent out on order into the "stream" of interstate commerce. The plaintiff earnestly pleaded with Leader to permit it to ship this merchandise to the purchasers, but he has refused to permit a single piece to be moved.

The plaintiff has earnestly and persistently tried to negotiate with Leader for a settlement of this so-called strike and has offered to comply with any requirement except sign an agreement for a closed shop. This is practically all that was demanded of him, for there has never been any complaint as to wages, working hours, or conditions, or the treatment of employees.

There was no strike or difficulty of any kind at the plaintiff's plant. Its pay roll was about $70,000 per week and it did an annual business of approximately $5,000,000. There was a peaceful situation in this plant in which everybody was satisfied. The plaintiff alleges, without contradiction, that it was paying the highest wages and had the best and most desirable working conditions in the entire industry. No complaint of any kind was made by a single employee. The so-called sit-down strike was in fact not a strike. If there had been a strike or any labor trouble at the plaintiff's factory, the law provides a remedy for its peaceful settlement. The main purpose of the Wagner-Connery Labor Relations Act, 29 U.S.C.A. §§ 151–166, was to avoid industrial strife by providing an orderly process of settling controversies and causes of unrest. It defines and declares the rights of labor and provides machinery for enforcing them.

Underlying this case is the question of whether a few lawless individuals ignoring and contemning the Wagner Act and in defiance of all law and order, and in ruthless disregard of the rights of others should be permitted, by assuming the name of a Union, to deprive all others of their means of livelihood and compel them to contribute

of their earnings to self-styled leaders. A few "sit-downers" are keeping 2,500 persons who were entirely satisfied with their positions from working and from earning an honest living for themselves and their families. If an employer had denied to labor any of its rights, the Wagner Act provided an orderly way of calling him to account. Instead of resorting to this act, the defendants by force and violence sought to compel the employer and its employees to do what the Wagner Act does not countenance and what the judgment of every true friend of labor and of all good men condemns as wrong both in policy and principle. Public opinion will sympathize with labor in using every fair, just, and legal means to secure and protect its rights, but public opinion—and this includes the sane, sober, thoughtful, and law-abiding element of labor—will feel outraged at the lawless conduct of the defendants which, if tolerated, would strike down American institutions, flout our long cherished principles of even-handed justice, and destroy the foundations of the government itself. Not even counsel for the defendants condoned their lawless, criminal conduct in this case, but in open court condemned it.

■ The defendants and their associates without cause and reason forced themselves upon and into the plaintiff's property and have ever since retained illegal possession of it and in addition to the property destroyed and other damage done, they are causing a daily loss to the plaintiff of $2,500. The seizure and detainer were unlawful and criminal.

The Act of Pennsylvania of March 31, 1860, § 21 (18 P.S.Pa. § 511) provides that:

"If any person shall with violence and a strong hand enter upon or into any lands or buildings, either by breaking open doors, windows or other parts of a house, or by any kind of violence or other circumstances of terror, or if any person, after entering peaceably, shall turn out by force or by threats, or menacing conduct, the party in possession, every person so offending shall be guilty of a forcible entry, and on conviction shall be sentenced to pay a fine not exceeding five hundred dollars, or to undergo an imprisonment not exceeding one year, or both, or either, at the discretion of the court, and to make restitution of the lands and tenements entered as aforesaid."

The same statute § 22, 18 P.S.Pa. § 512, provides that:

"If any person shall by force and with a strong hand, or by menaces or threats, un-lawfully hold and keep the possession of any lands or tenements, whether the possession of the same were obtained peaceably, or otherwise, such person shall be deemed guilty of forcible detainer, and upon conviction thereof shall be sentenced to pay a fine not exceeding five hundred dollars, or to undergo an imprisonment not exceeding one year, or both, or either, at the discretion of the court, and to make restitution of the lands and tenements unlawfully detained as aforesaid: Provided, That no person shall be adjudged guilty of forcible detainer, if such person, by himself, or by those under whom he claims, has been in peaceable possession for three years next immediately preceding such alleged forcible detention."

After failing in every effort to reach an agreement with the defendants, plaintiff was finally driven to file the bill in this case wherein it prayed among other things, that the defendants be enjoined and restrained from violating the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, the Clayton Act, 38 Stat. 730, and the National Labor Relations Act, 29 U.S.C.A. §§ 151–166, from "interfering in any way with plaintiff in manufacturing and shipping hosiery and from in any way or by any means intimidating, coercing or threatening plaintiff's employees or their families; that defendants be directed forthwith to surrender and vacate plaintiff's premises and that plaintiff recover from defendants three-fold damages sustained by plaintiff, costs and attorneys' fees."

■ The sole question is whether or not the acts of the defendants have so burdened, obstructed, or stopped the plaintiff's raw materials and manufactured products from entering the stream or free flow of interstate commerce as to constitute restraint of trade or commerce within the prohibitory provisions of the Sherman Act.

The plaintiff contends that the defendants violated the Sherman Anti-Trust Act of July 2, 1890 (15 U.S.C.A. § 1) in that they conspired to restrain interstate commerce. That act provides that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

There can be no doubt that they conspired to do what they did. The question is whether or not what they did constitutes restraint of interstate commerce as now defined and interpreted, and whether or not

they conspired to do it with intent to restrain interstate commerce.

The plaintiff's business is almost entirely interstate in character. Its factory is located in Philadelphia, in the commonwealth of Pennsylvania. The raw materials which it manufactures into hosiery are silk and cotton. The silk comes from Japan and the cotton from the southern states. These materials come into the plaintiff's factory in Philadelphia, are there manufactured into the finished product, and then 85 per cent. of it is sold and shipped across state lines to points outside of Pennsylvania.

It would not be profitable here to trace the expanding definitions and applications of "commerce" as used in the past in the Constitution and the Sherman Act under other conditions. We are concerned with what the law is today. In the case of National Labor Relations Board v. Jones & Laughlin Steel Corporation, 57 S.Ct. 615, 619, 81 L.Ed. ——, decided April 12, 1937, the Supreme Court found that the Steel Corporation with its subsidiaries formed a completely integrated enterprise and that its plant at Aliquippa, Pa., secured in part its ore, limestone, and other materials used in manufacturing its finished product from other states—Michigan, Minnesota, West Virginia, and elsewhere—and after the product had been finished or semifinished, it was shipped from Aliquippa to Chicago, Detroit, Cincinnati, Memphis, New Orleans, New York, and elsewhere outside of Pennsylvania. The court said:

"Summarizing these operations, the Labor Board concluded that the works in Pittsburgh and Aliquippa 'might be likened to the heart of a self-contained, highly integrated body. They draw in the raw materials from Michigan, Minnesota, West Virginia, Pennsylvania in part through arteries and by means controlled by the respondent; they transform the materials and then pump them out to all parts of the nation through the vast mechanism which the respondent has elaborated.'"

In that case the Steel Corporation was charged with discriminatory action because it discharged for union activities ten of its employees who were members of a labor union. It contended that its employees were not subject to regulation by the federal government because they were not engaged in interstate commerce.

The court held that whatever burdens or obstructs the stream or free flow of interstate or foreign commerce was within the reach of the congressional power; that the importation of raw material into Aliquippa and the exportation therefrom of the manufactured product did constitute interstate commerce which conferred jurisdiction upon the federal court; and the discharge of the employees under the facts in that case interfered with the free flow of interstate commerce and that the stoppage of that free flow would have a most serious effect upon interstate commerce. Chief Justice Hughes said: "In view of respondent's far-flung activities, it is idle to say that the effect would be indirect or remote. It is obvious that it would be immediate and might be catastrophic."

It is true that the interests of the Jones & Laughlin Steel Corporation were much larger and more diversified than those of the Apex Hosiery Company, but those of the Friedman-Harry Marks Clothing Company were much smaller. The Supreme Court decided the latter case (National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 57 S.Ct. 645, 81 L.Ed. ——) against that company the same day and in the same way that it decided the case against the Jones & Laughlin Corporation.

The facts in the case at bar, which are strikingly similar to those in the Friedman-Harry Marks Company Case, bring it directly within the law declared in that case and in the Jones & Laughlin Case, supra, and that law is controlling here. The seizure and retention of the plaintiff's property did not simply burden, restrain, or obstruct the stream or free flow of interstate commerce, coming into and going out of plaintiff's factory, but they absolutely stopped and dammed it up.

In the Jones & Laughlin Case, which was brought under the Wagner Act, the Supreme Court declared what conduct in relation to interstate commerce comes within federal control and gives federal courts jurisdiction. It makes no difference, so far as jurisdiction is concerned, whether that conduct violates the provisions of the Sherman Act or the Wagner Act. The Sherman Act provides that every combination or conspiracy in restraint of trade or commerce among the several states is declared to be illegal. It is undisputed in the case at bar that there was a combination, a conspiracy, which actually restrained trade, and interstate commerce. The Supreme Court in the Jones & Laughlin Case has defined commerce among

160

the several states and the facts in the present case bring it within that definition. Hosiery of the value of $600,000, as above stated, had been manufactured and made into the finished product from raw materials imported from the southern states and from a foreign nation, had been sold and was ready to be shipped out of the commonwealth when the factory was seized. The defendants by combination and conspiracy have been holding possession of this merchandise ever since the unlawful seizure and have thus restrained it from going into the stream of interstate commerce. This and other conduct clearly violate the provisions of the Sherman Act.

■ Defendants argue that it is necessary not only to prove that they obstructed and stopped the free flow of interstate commerce, but also to prove that they conspired with intent to do so.

Intent is the very essence of a conspiracy. It, however, is necessarily a fact to be inferred from the acts of the conspirators. No one could be heard to deny that he had intended to do what he had voluntarily and deliberately done. None of these defendants would have the temerity to deny that he was a member of a conspiracy. The whole argument addressed to us is that the evidence does not disclose an intent or purpose to interfere with or restrain interstate commerce. The defendants in effect argue that the purpose of the conspiracy here was not aimed at interstate commerce but at the plaintiff, to compel it to yield to their demand for a closed shop and check-off; that, however unlawful their acts were, they were incidental, only a means to an end, and do not constitute a conspiracy in restraint of interstate commerce.

This argument overlooks the fact that a strike if lawfully conducted is in itself lawful and its lawfulness now has statutory recognition. There could be no conspiracy under the Sherman Act or otherwise because of doing a lawful thing. It could not become a conspiracy unless the means employed were unlawful. It may be that the ultimate intent of the conspirators in this case was to force the plaintiff to sign an agreement for a closed shop. This would be perfectly all right if the defendants had used lawful means to bring it about, but when they used unlawful means—the commission of crimes and the restraint of interstate commerce—they knew exactly what they were doing and must have intended, as rational beings, to do exactly what they did. The ultimate object which they had in view in no way exculpates them from the violation of the Sherman Act.

"When the intent of those unlawfully preventing the manufacture or production is shown to be to restrain or control the supply entering and moving in interstate commerce * * * their action is a direct violation of the Anti-Trust Act." Coronado Co. v. United Mine Workers, 268 U.S. 295, 310, 45 S.Ct. 551, 556, 69 L.Ed. 963. "And the existence of that intent may be a necessary inference from proof of the direct and substantial effect produced by the employees' conduct." National Labor Relations Board v. Jones & Laughlin Steel Corporation, supra. The defendants knew full well that the silk and cotton used in making hosiery came from outside of Pennsylvania. They also knew that when they seized and stopped the operations in that factory and refused to allow the $600,000 worth of finished hosiery to be sent to the purchasers, they were restraining trade and the free flow of interstate commerce. This was a necessary and direct consequence of their acts and they must be held to have intended it. United States v. Patten, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.(N.S.) 325; Bluefields S. S. Co. v. United Fruit Co. (C.C.A.) 243 F. 1.

It follows that the decree of the District Court must be reversed with directions forthwith to reinstate the bill, grant the injunctions prayed for, and order the defendants immediately to vacate the property and restore it to the possession of the plaintiff, its rightful owner.

And it is further ordered that the mandate from this court go down without delay and that this court retain jurisdiction of the cause so far as is necessary to aid, protect, and enforce its appellate jurisdiction.