**WILSON & CO. v. BIRL et al.**

No. 158.

District Court, E. D. Pennsylvania.

Feb. 8, 1939.

916

Joseph S. Conwell and Pepper, Bodine, Stokes & Schoch, all of Philadelphia, Pa., for plaintiff.

Louis F. McCabe, Wm. A. Gray, and Albert J. Bader, all of Philadelphia, Pa., for defendants.

KIRKPATRICK, District Judge.

The prayer for a temporary injunction will be denied.

This case grows out of a labor dispute.

The plaintiff is engaged in the wholesale meat business, with a plant in Philadelphia where it receives, stores and sells meat and certain other agricultural products, and does some processing. Practically all the meat which the plaintiff handles at its Philadelphia plant is shipped to it in interstate commerce, and twenty-five per cent of the products sold by it are delivered to its customers by interstate shipments, mostly in its own delivery trucks.

The defendants are three labor unions, their officers, and certain individuals, members of the unions.

Local 195 includes all but five of the plaintiff's employees in its production and maintenance department. This union is on strike to obtain a closed shop agreement. The specific demand is that the plaintiff discharge the five nonunion employees or compel them to join the union.

Local 107 includes all the plaintiff's chauffeurs, truckers and platform men. It is on strike to assist 195 in obtaining a closed shop agreement. The specific occasion of the strike of 107 was the discharge by the plaintiff of two of its members who refused to handle the plaintiff's products so long as the five nonunion men remained in its employ.

The members of Local 18571 are not employees of the plaintiff, but of a cold storage warehouse, where the plaintiff stores a substantial quantity of its products. This union is not on strike, but its members have refused to handle the plaintiff's products, and the plaintiff is unable to get them from the warehouse. The purpose of this action on the part of 18571 is to assist 195 in obtaining its objective.

There is no proof of any express agreement by word between the defendants, but it clearly appears that there is mutual understanding, combination and concert of action among them, and that it is their common purpose to compel the plaintiff to enter into a closed shop agreement with Local 195.

In general, the means by which the objective of the defendants is sought is inflicting loss upon the plaintiff through as complete suspension of its business as the defendants can accomplish. The defendants are not seeking the total destruction of the plaintiff's business, but are perfectly willing to risk that rather than recede from their position on the closed shop. More specifically, the means used are:

a. A strike; and refusal to handle or move the plaintiff's products.

b. Picketing the plaintiff's place of business.

c. Visiting the plaintiff's customers and requesting them not to accept deliveries of goods or place orders, and threatening them with the picketing of their places of business if they do—a threat which, in some cases, has been carried out.

In addition to the foregoing, members of various unions sympathetic with the defendants have refused to handle products of the plaintiff. There is no proof that this is at the request or instigation of the defendants, but there is no doubt that it will cease as soon as this labor dispute is ended.

The defendants' program is almost completely effective. The plaintiff's business has dwindled to a small fraction of its former volume, customers and good will have been lost, and the plaintiff is

suffering and will continue to suffer irreparable loss.

In general the program has been carried out in an orderly manner. There have been three or four instances of violence. There is no evidence that these have been authorized or ratified by the unions and there is no evidence that any of the defendants participated in them, except William A. Devlin, William Arbucus, and Peter Barron, the last two of whom have made threats only.

I find that the plaintiff has complied with the requirements of Sec. 8 of the Norris-LaGuardia Act, 29 U.S.C.A. § 108. Negotiations reached an absolute impasse several weeks before the strike, and it is perfectly evident that nothing further can be accomplished by them. It would be senseless to require the plaintiff to go through the form again.

As to the requirements of Sec. 7. The picketing of the plaintiff's plant is being carried on under police supervision and control, and the police appear to have supplied protection against injury to physical property. If the plaintiff is entitled to protection against loss of business through the visitations of the defendants to its customers, then the public officers are either unable or unwilling to furnish adequate protection in this regard.

With the exception of the acts of violence referred to, the labor unions, their officers and members have been clearly shown to have participated in or authorized or ratified the various measures taken by the defendants described above. It is also a fact that greater injury will be inflicted upon the complainants by the denial of the relief asked for than will be inflicted upon the defendants by the granting of the relief.

The complainant has no adequate remedy at law.

The foregoing findings of fact are made so that, if the appellate court reaches a different conclusion as to the right of the plaintiff to an injunction, further proceedings will not be necessary.

■ The Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., was intended to limit drastically the power of the Federal courts to issue injunctions in labor disputes. In fact, it might be said in a general way that the purpose was to put an end to it, except for a residue of jurisdiction necessary for the protection of property against destruction by violence or fraud.

To accomplish the purpose of the Act, Congress enumerated in Sec. 4 various types of conduct as to which jurisdiction to enjoin was taken away. The list covered a wide field of labor conflict activities and impliedly recognized the conduct in question as legitimate measures of offense and defense in labor disputes.

■ In this enumeration the Act is wholly objective. It is not concerned with the purpose for which the acts are done or with the state of mind of the participants or with any question of intent, expressed or presumed. The law makes no distinction between doing the acts in question with a legal object in view and doing them with an illegal object. See Levering & Garrigues Co. v. Morrin, 2 Cir., 71 F.2d 284. In short, it was an adoption of the philosophy of Justice Brandeis's dissenting opinion in Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 183, 65 L.Ed. 349, 16 A.L.R. 196, which condemned the point of view which made conduct actionable "when done for a purpose which a judge considered socially or economically harmful and therefore branded as malicious and unlawful." The only question is whether the acts which the plaintiff seeks to restrain are among those enumerated in Sec. 4 of the Act. If they are, this Court has no power to enjoin them.

Hence, it is immaterial whether the closed shop, plainly the objective of the defendants' program, is, by the law of Pennsylvania, a legal or an illegal end, and, for the same reasons, were it not for the decisions of the Circuit Court of Appeals for this Circuit in Apex Hosiery Co. v. Leader, 3 Cir., 90 F.2d 155 (a matter to be discussed later), I should have said that it was also immaterial whether or not the defendants intended to restrain interstate commerce.

■ Probably the most effective part of the defendants' program is the following of the plaintiff's delivery trucks to the places of business of various customers and there advising the customers of the existence of the labor dispute, asking them to reject the goods, and threatening them with picketing their places of business if they accepted the deliveries, followed by actual picketing in a few cases where the customers declined to reject the product.

918

This comes within at least some of the definitions of the "secondary boycott."

Sec. 4(e) takes away the power to enjoin "giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence." This language is very broad and contains no restriction as to where the "advertising" and "patrolling" may be carried on except that it must not involve fraud or violence. Neither of these elements appears in this part of the present case.

█ In view of the clear purpose of the Act to take the Federal courts out of the business of granting injunctions in labor disputes, except where violence and fraud are present—a purpose which stands out in almost every paragraph—I am of · the opinion that Sec. 4(e) prohibits the granting of an injunction against the conduct of the defendants just referred to.

██ Even if it did not, the result would be the same. If the conduct sought to be restrained is not expressly withdrawn from the Court's jurisdiction, the question remains whether or not it is illegal. That would depend upon the law of Pennsylvania. The Pennsylvania Labor Anti-Injunction Act of 1937, 43 P.S.Pa. § 206a et seq., prohibits the granting of injunctions against picketing "any public street or place where any person or persons may lawfully be," .and thus, by removing the power of the courts to act, recognizes that picketing any person's place of business is legal, provided, of course, it has some relation to the ends which the defendant is seeking to obtain in a labor dispute.

This brings us to what may be called the "Sherman Act phase" of the case. Undoubtedly the defendants' acts have resulted in the "reduction in the supply of an article to be shipped in interstate commerce." It was formerly the law that the mere fact that a strike or other measures by a labor combination resulted in such reduction was not proof of an intent to violate the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note. Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963. And this was true despite the fact that the supply was reduced by illegal and tortious acts stopping production. The Apex opinion [90 F.2d 159] (with the statement, "We are concerned with what the law is today") held that the Supreme Court's decision in the Jones & Laughlin Case, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, impliedly overruled this and other decisions. ·

In view of the fact that the Supreme Court of the United States has not yet spoken upon the important question of the effect of the Jones & Laughlin case upon the earlier Sherman Act decisions, I think that it would be unwise to extend the scope of the Apex decision beyond what its facts strictly require.

█ What is actually ruled in that case is that the total stoppage of production, in a plant engaged in interstate commerce, by illegal seizure of the plant itself carries with it the conclusive presumption that the guilty parties intended to restrain interstate commerce. I do not think it was meant to rule in the Apex case that the reduction of the supply of an article in interstate commerce carries such presumption in every case, or specifically, where the purpose and methods of the defendants are lawful. The decision leaves room for a fact finding in cases where the restraint arises from conduct like that in this case, and I make the finding that it was not the intent of these defendants to restrain interstate commerce. And if, under the Apex decision, the legality or illegality of the purpose of the combination is a matter of importance, that decision itself supplies the answer that the closed shop is a legal objective. The Court said, "It may be that the ultimate intent of the conspirators in this case was to force the plaintiff to sign an agreement for a closed shop. This would be perfectly all right if the defendants had used lawful means to bring it about * * *." The conclusion is that the fact that the result of these defendants' acts has been to reduce the supply of the plaintiff's products moving in interstate commerce, does not entitle the plaintiff to an injunction on the ground of a violation of the Sherman Anti-Trust Act.

█ I have considered the plaintiff's argument for an injunction based on the alleged breach of a contract on the part of the unions not to press for a closed shop in consideration of a wage increase, but I am of the opinion that that clearly does not present any ground for the issuance of an injunction.

The prayer for a temporary injunction is refused with leave to renew it by motion as to the defendants Devlin, Arbucus and

Barron unless these persons cease immediately to participate in any of the activities of the defendants connected with this labor dispute. If it appears to the Court that they are still taking part in any of such activities, the prayer for a temporary injunction may be renewed as to them by motion.