## LEADER et al. v. APEX HOSIERY CO.
### No. 7085.

Circuit Court of Appeals, Third Circuit.
Nov. 29, 1939.

Rehearing Denied Dec. 27, 1939.

Writ of Certiorari Granted Feb. 26, 1940.

See 60 S.Ct. 589, 84 L.Ed. ——.

Isadore Katz, of Philadelphia, Pa., for appellant.

Sylvan H. Hirsch, Allen J. Levin, Arno P. Mowitz, and Stanley Folz, all of Philadelphia, Pa. (Sundheim, Folz & Sundheim, of Philadelphia, Pa., of counsel), for appellee.

Carol King, of New York City (Nathan Greene, of New York City, of counsel), amicus curiæ, for Internal Juridical Ass'n.

Lee Pressman, Joseph Kovner, and Anthony Wayne Smith, all of Washington, D. C. (M. H. Goldstein, of Philadelphia, Pa., and Alfred Udoff, of New York City, of counsel), amici curiae.

Louis B. Boudin, of New York City, and Francis R. Taylor, of Philadelphia, Pa. (Louis B. Boudin, of New York City, and Alexander H. Frey, Felice E. Darkow, and Philip Dorfman, all of Philadelphia, Pa., of counsel), for National Lawyers Guild.

Herman I. Pollock, of Philadelphia, Pa. (Osmond K. Fraenkel, of New York City, of counsel), amicus curiae for American Civil Liberties Union.

Before BIGGS, MARIS and CLARK, Circuit Judges.

BIGGS, Circuit Judge.

Apex Hosiery Company, a Pennsylvania corporation, brought suit in the court below naming as defendants American Federation of Full Fashioned Hosiery Workers, Philadelphia Branch No. 1, Local No. 706, an unincorporated association, Leader, its president, Burge, its vice-president, Omeig, its treasurer, and Brown, its secretary, and the members of the Union, alleging violation of the anti-trust laws of the United States. The amended complaint alleged that jurisdiction was vested in the court below by virtue of Section 4 of the Act of October 15, 1914, 38 Stat. 730, 731;[1] 15 U.S.C.A. § 15, known as the Clayton Act, entitling a person injured in his business or property by acts forbidden by the anti-trust laws to recover three-fold for damages sustained by him.

The facts of the controversy at bar are not in dispute. Apex Hosiery Company manufactures hosiery in its factory at Philadelphia, Pennsylvania, employs more than 2,500 persons and does an annual business of approximately $5,000,000. It procures its raw materials, principally silk and cotton, from outside the State of Pennsylvania and ships over eighty percent of its completed merchandise across state lines. The Apex Company insisted upon maintaining an open shop. The appellant union made attempts to induce the company to enter into a closed shop contract. These attempts were unsuccessful.

In the middle of April, 1937, the union made further demands for a closed shop

[1] "That any person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

agreement. Nothing came of those demands. On May 4, 1937, the union authorized Leader to call a strike at the Apex plant. Only eight of the company's employees at this time were members of the Union. On May 6th, at about two o'clock in the afternoon, a mob of fifteen to twenty thousand persons, consisting of employees of other hosiery mills in Philadelphia which had been unionized, gathered outside the plant and Leader made a further demand for a closed shop agreement. When this was refused Leader forthwith declared a sit-down strike and immediately acts of great violence were committed against the plant and employees of the company. The plant was seized by members of the mob, some of whom remained in control of the plant until June 23, 1937. All of the locks on the outer doors and entrances of the plant were changed and no one was permitted entrance to the premises except by leave of those in possession. At the time of the seizure, the Apex Company had on hand approximately 134,000 dozens of finished hosiery ready for shipment against unfilled orders, eighty percent of which were from customers outside the State of Pennsylvania. The company repeatedly requested permission to ship this hosiery from the plant, but this was refused. During the course of the sit-down strike machinery was wantonly demolished or damaged to the extent of many thousands of dollars. The usurpation of the company's rights in its own property and the demolition of machinery and equipment, were conducted without interference by those local authorities charged with enforcing law and order in the City of Philadelphia. These facts which are not open to dispute show the existence of the sit-down strike in its most aggravated and illegal form. Judicial condemnation of such tactics cannot be too severe. They serve the cause of labor badly indeed and the public good fares worse before such a display of lawlessness. We have already expressed our views in this regard in our opinion in McNeely & Price Company v. National Labor Relations Board, 3 Cir., 106 F.2d 878, and need not repeat here the words there used. See National Labor Relations Board v. Fansteel Corporation, 306 U:S. 240, 255, 256, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599.

The sit-down continued until the entry of an injunction decree by the court below on June 23, 1937, pursuant to the mandate of this court in the prior equity suit of Apex Hosiery Co. v. Leader, 3 Cir., 90 F.2d 155. Following this decree the sit-down strike came to an end and the premises were returned to the possession of the Apex Company.

The suit at bar followed. After extensive hearings the jury returned a general verdict against Leader and the union in the sum of $237,210.85, but rendered a verdict in favor of Burge, Omeig, Brown and the individual members of the union. The verdict included damages for injury to machinery and equipment, fixed and carrying charges which were deemed necessary expenses for maintaining the plant and loss of profits to the company during the period of the plant's occupancy by the strikers. The trial court trebled the amount of the verdict in accordance with Section 4 of the Clayton Act and entered judgment in triple amount. The appellants filed motions to set aside the verdict and judgment and moved for a new trial. These motions were denied by the trial judge and the present appeal was taken.

The fundamental questions raised by this appeal may be stated as follows. Was there or was there not a violation of the anti-trust laws of the United States and was the damage suffered by the appellee the proximate result of such violation? We entertain no doubt that the appellants should be compelled in the appropriate forum to answer in damages to the appellee. The crux of the problem, however, is whether the appellee is entitled to recover treble damages under the Clayton Act in a district court of the United States or whether it must seek relief in the courts of the Commonwealth of Pennsylvania. In short, upon all the evidence presented are the appellees shown to have been guilty of an offense cognizable under the anti-trust laws or should the trial court have directed a verdict in their favor? The answer to these questions is to be found in the anti-trust laws and in the applicable decisions construing and interpreting them.

The Provisions of the Sherman Act.

The Sherman Act was approved July 2, 1890, 26 Stat. 209. Sections 1 and 2 of the Act, 15 U.S.C.A. §§ 1, 2, are in part, as follows:

"§ 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

among the several States, or with foreign nations, is hereby declared to be illegal * * *."

"§ 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *."

■ It will be seen that by its very terms the Act includes the activities of any and all organizations in restraint of trade and renders them illegal. Congress did not limit the restraint imposed by the Act to business combinations. It included all combinations in restraint of trade within the purview of the Act. See Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A.,N.S., 874; United Mine Workers v. Coronado Coal Company, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762; Coronado Coal Company v. United Mine Workers, 268 U.S. 295, 298, 45 S.Ct. 551, 69 L.Ed. 963; Bedford Cut Stone Co. v. Journeymen Stonecutters' Association, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791.

■ Following the widespread complaints of labor organizations that they had been subjected improperly to the provisions of the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, the Clayton Act, 38 Stat. 730, was passed. Section 6 of that Act, 15 U.S.C.A. § 17, provided "That the labor of a human being is not a commodity or article of commerce." It also provided that nothing contained in the anti-trust laws should " * * * * be construed to forbid the existence and operation of labor * * * organizations, instituted for the purposes of mutual help, * * *". It was contended that the words employed indicated an intention on the part of Congress to remove labor from the operation of the anti-trust laws, for obviously if labor is not an article of commerce it cannot be in commerce. But this contention was repudiated expressly in Duplex Printing Press Co. v. Deering, 254 U.S. 443, page 469, 41 S.Ct. 172, page 177, 65 L.Ed. 349, 16 A.L.R. 196, in which the Supreme Court said: "The section [section 6, 15 U.S.C.A. § 17] assumes the normal objects of a labor organization to be legitimate, and declares that nothing in the anti-trust laws shall be construed to forbid the existence and operation of such organizations or to forbid their members from lawfully carrying out their legitimate objects; and that such an organization shall not be held in itself—merely because of its existence and operation—to be an illegal combination or conspiracy in restraint of trade. But there is nothing in the section to exempt such an organization or its members from accountability where it or they depart from its normal and legitimate objects and engage in an actual combination or conspiracy in restraint of trade. And by no fair or permissible construction can it be taken as authorizing any activity otherwise unlawful, or enabling a normally lawful organization to become a cloak for an illegal combination or conspiracy in restraint of trade as defined by the anti-trust laws."

While the relief granted in the Duplex case was by way of injunction against the offending unions and the suit at bar is for money damages, we cannot see how such a distinction, viewed in the light of the decision of the Supreme Court in the cited case, would serve to remove the activities of the appellants from the purview of the Sherman Act. It follows therefore that if the record in the suit at bar will support the conclusion that the appellants engaged in a conspiracy in restraint of trade, Section 6 of the Clayton Act will not serve to remove their activities from the operation of the anti-trust laws of the United States.

### The Application of the Sherman Act to Business Combinations.

■ The absolute terms of the Sherman Act were subjected early to judicial construction resulting in the so-called "rule of reason". In Hopkins v. United States, 171 U.S. 578, 592, 19 S.Ct. 40, 45, 43 L.Ed. 290, the Supreme Court stated: "The contract condemned by the statute is one whose direct and immediate effect is a restraint upon that kind of trade or commerce which is interstate. * * * To treat as condemned by the act all agreements under which, as a result, the cost of conducting an interstate commercial business may be increased, would enlarge the application of the act far beyond the fair meaning of the language used. There must be some direct and immediate effect upon interstate commerce, in order to come within the act." In Anderson v. United States, 171 U.S. 604, 615, 19 S.Ct. 50, 54, 43 L.Ed. 300, the Supreme Court stated: "Where the subject-matter of the agreement does not di-

rectly relate to and act upon and embrace interstate commerce, and where the undisputed facts clearly show that the purpose of the agreement was not to regulate, obstruct, or restrain that commerce, but that it was entered into with the object of properly and fairly regulating the transaction of the business in which the parties to the agreement were engaged, such agreement will be upheld as not within the statute * * *".

In Standard Oil Company v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734, the United States had endeavored to dissolve that holding company which controlled a principal part of the oil industry. The Supreme Court stated, 221 U.S., at page 66 of its opinion, 31 S.Ct. at page 518, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann. Cas.1912D, 734: "If the criterion by which it is to be determined in all cases whether every contract, combination, etc., is a restraint of trade within the intendment of the law, is the direct or indirect effect of the acts involved, then of course the rule of reason becomes the guide * * *".

The extent and intent of the interference with commerce considered against the background of social consequences, must furnish the criteria. for the determination of whether or not a combination and its acts are within the scope of the Sherman Act. See Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825. In the cited case the parties to the combination controlled 74.4% of the production of coal in the Appalachian area and 11.96% of the production of bituminous coal east of the Mississippi River. Chief Justice Hughes, delivering the majority opinion of the Court stated, 288 U.S. page 359, 53 S.Ct. page 474, 77 L.Ed. 825, "The purpose of the Sherman Anti-Trust Act is to prevent undue restraints of interstate commerce, to maintain its appropriate freedom in the public interest, to afford protection from the subversive or coercive influences of monopolistic endeavor. As a charter of freedom, the act has a generality and adaptability comparable to that found to be desirable in constitutional provisions." The Chief Justice went on to say, 288 U. S. page 360, 53 S.Ct. page 474, 77 L.Ed. 825, "The decisions establish, said this Court in Nash v. United States, 229 U.S. 373, 376, 33 S.Ct. 780, 781, 57 L.Ed. 1232, 'that only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade.'" The Chief Justice also stated 288 U.S. page 372, 53 S. Ct. page 478, 77 L.Ed. 825, "Good intentions will not save a plan otherwise objectionable, but knowledge of actual intent is an aid in the interpretation of facts and prediction of consequences," citing Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683, Ann.Cas.1918D, 1207.

In the more recent case of Sugar Institute, Inc. v. United States, 297 U.S. 553, 600, 56 S.Ct. 629, 642, 80 L.Ed. 859, Chief Justice Hughes found that the Sherman Act " * * * does not go into detailed definitions. Thus in applying its broad prohibitions, each case demands a close scrutiny of its own facts. Questions of reasonableness are necessarily questions of relation and degree. In the instant case, a fact of outstanding importance is the relative position of defendants in the sugar industry. We have noted that the fifteen refiners, represented in the Institute, refine practically all the imported raw sugar processed in this country. They supply from 70 to 80 per cent. of the sugar consumed. Their refineries are in the East, South, and West, and their agreements and concerted action have a direct effect upon the entire sugar trade." The Supreme Court held that the agreement imposed unreasonable restraints and required the cessation of the practices complained of by the United States.

In short, in respect to business combinations the Supreme Court has held there must be shown intent to restrict competition by control of supply or fixing prices of the commodity or articles under circumstances where such domination substantially affects the market or industry, and therefore the price to the consumer; or such intent may be inferred from the effect of the combination upon interstate commerce.

### The Application of the Sherman Act to Labor Combinations.

The provisions of the Sherman Act were early applied to the activities of labor unions. The first case in this field is that of Blindell v. Hagan, C.C., 54 F. 40, in which it was held that the provisions of the Sherman Act curtailed. the activities of the crew of a steamship who struck and prevented the hiring of a new crew. The court was dealing with a ship, an in-

strumentality of commerce and the comparatively small extent of the interference with commerce in general was not permitted to remove the activities of the strikers from the operation of the Sherman Act. The law was applied rigorously and literally. See also Waterhouse v. Comer, C.C., 55 F. 149, 19 L.R.A. 403.

The first decision of the Supreme Court applying the Sherman Act to the activities of labor organizations was Loewe v. Lawlor, supra. In this case the American Federation of Labor had attempted to compel Loewe & Company, manufacturers of hats, to operate upon a closed shop basis. When this demand met with refusal, a strike ensued at the company's plant and a secondary boycott was inaugurated throughout the United States. Suit for damages was brought against the union and its individual members by the company as in the case at bar. The Supreme Court held that the secondary boycott was illegal and that the suit might be maintained against the individual members of the union. The ratio decidendi of Hopkins v. United States, supra, was emphasized by the appellees but the Supreme Court, having in mind the size of the combination, stated that the 9,000 members of the United Hatters of North America had acted in concert with the 1,400,000 members of the American Federation of Labor, compelling the great majority of the manufacturers of fur hats in the United States to unionize their plants. The Court found that the hatters intended to interfere directly with interstate commerce by means of the secondary boycott and reversed the decision of the court below which had dismissed the complaint upon demurrer. After trial and judgment in favor of the company the case came before the Supreme Court for the second time and was decided upon the same principles of law. Lawlor v. Loewe, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341.

In the case of United Mine Workers v. Coronado Company, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762, known as the first Coronado case, the receiver for the company which controlled the Coronado Coal Company and other companies desired to operate the coal properties upon a non-union basis despite an agreement to the contrary with the United Mine Workers. A strike resulted attended by great violence by the parties to the controversy. The mine properties were greatly damaged. Suit was brought by the companies against the United Mine Workers of America, twenty-seven local unions and a number of individuals, charging them with a conspiracy to restrain interstate commerce in coal and with destruction of property. Treble damages were prayed for. The unions demurred to the complaint, in effect denying that the Sherman Act conferred jurisdiction upon the court. The District Court sustained the demurrer but was reversed by the Circuit Court of Appeals. Dowd v. United Mine Workers, 8 Cir., 235 F. 1. A trial was had in which substantial damages were awarded, which were trebled. A further appeal was taken to the Circuit Court of Appeals, United Mine Workers v. Coronado Coal Co., 8 Cir., 258 F. 829, which sustained the judgment. Thereupon the defendants appealed to the Supreme Court which held that though the local unions were responsible for the destructive actions of their members, none the less there was no proof that the unions had engaged in a conspiracy to monopolize or restrain interstate commerce in defiance of the Sherman Act.

Chief Justice Taft, delivering the unanimous opinion of the Supreme Court, stated, 259 U.S. page 408, 42 S.Ct. page 582, 66 L.Ed. 975, 27 A.L.R. 762, "Obstruction to coal mining is not a direct obstruction to interstate commerce in coal, although it, of course, may affect it by reducing the amount of coal to be carried in that commerce. We have had occasion to consider the principles governing the validity of congressional restraint of such indirect obstructions to interstate commerce in Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; United States v. Patten, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.(N.S.) 325; United States v. Ferger, 250 U.S. 199, 39 S.Ct. 445, 63 L.Ed. 936 * * *. It is clear from these cases that if Congress deems certain recurring practices though not really part of interstate commerce, likely to obstruct, restrain or burden it, it has the power to subject them to national supervision and restraint. Again, it has the power to punish conspiracies, in which such practices are part of the plan to hinder, restrain, or monopolize interstate commerce. But in the latter case the intent to injure, obstruct, or restrain interstate commerce must appear as an obvious consequence of what is to be done, or be shown by direct evidence or other circumstances."

Chief Justice Taft went on to say, 259 U.S. page 409, 42 S.Ct. page 583, 66 L.Ed. 975, 27 A.L.R. 762, "This case is very different from Loewe v. Lawlor * * *. There the gist of the charge held to be a violation of the Anti-Trust Act was the effort of the defendants, members of a trade union, by a boycott against a manufacturer of hats, to destroy his interstate sales in hats. The direct object of attack was interstate commerce."

The Supreme Court applied the criterion of the intent of the strikers to affect interstate commerce without regard to whether or not the actions of the combination in preventing the distribution of coal from the mines, could actually affect the volume of commerce in coal or the price of it. Chief Justice Taft found, 259 U.S. page 412, 42 S.Ct. page 584, 66 L.Ed. 975, 27 A.L.R. 762, that the strike was a local strike, "local in its origin and motive, local in its waging, and local in its felonious and murderous ending." The Supreme Court thereupon reversed the judgment rendered against the United Mine Workers and their officers, remanding the cause for further proceedings.

In Coronado Coal Company v. United Mine Workers of America, 268 U.S. 295, 310, 45 S.Ct. 551, 556, 69 L.Ed. 963, known as the second Coronado case, the Supreme Court had additional evidence before it. This evidence included testimony as to the responsibility of union officials for the strike and to the effect that the production of coal of the Bache-Denman mines was more than 5,000 tons a day and not 5,000 tons a week as had been supposed. The Court held that when it was the intent of those interfering with the production of coal " * * * to restrain or control the supply [of coal] * * * moving in interstate commerce * * *" this constituted a direct violation of the anti-trust laws. Chief Justice Taft concluded by stating, "We think there was substantial evidence at the second trial in this case tending to show that the purpose of the destruction of the mines was to stop the production of nonunion coal and prevent its shipment to markets of other states than Arkansas, where it would by competition tend to reduce the price of the commodity and affect injuriously the maintenance of wages for union labor in competing mines, and that the direction by the District Judge to return a verdict for the defendants other than the International

Union was erroneous." The Supreme Court thereupon affirmed the judgment in favor of the International Union of United Mine Workers and reversed that in favor of the district and local unions, remanding the cause for further proceedings.

In United Leather Workers' International Union v. Herkert & Meisel Trunk Co., 265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A.L.R. 566, the complainants had built up valuable business in manufacturing trunks and leather goods and in selling the greater number of these articles in interstate commerce. The bill of complaint expressly alleged that with the intention of ruining this interstate business, a strike was commenced by the United Leather Workers and that this strike was carried on through illegal picketing and intimidation of workers, the strikers being well aware that the products of the complainants when made were shipped through interstate commerce. The Supreme Court held that a mere reduction in the amount of articles to be shipped in interstate commerce and the illegal prevention of their manufacture did not bring the activities of the strikers within the purview of the Sherman Act. The Court by Chief Justice Taft stated, page 471, 44 S.Ct. page 627, 68 L.Ed. 1104, 33 A.L.R. 566, "This review of the cases makes it clear that the mere reduction in the supply of an article to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture is ordinarily an indirect and remote obstruction to that commerce. It is only when the intent or the necessary effect upon such commerce in the article is to enable those preventing the manufacture to monopolize its supply or control its price, or discriminate as between its would-be purchasers, that the unlawful interference with its manufacture can be said directly to burden interstate commerce."

In Levering & G. Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062, the complainants were engaged in fabricating and erecting structural iron and steel and attempts were made by unions in the City of New York to compel them to employ only union labor in this work. The bill of complaint alleged that all the steel used by the complainants in the City of New York was transported from other states and that the success of the respondents' efforts would result in the destruction of the complainants' interstate traffic in steel. Mr. Justice Sutherland delivered the opin-

ion of the Supreme Court and stated, 289 U.S. page 107, 53 S.Ct. page 551, 77 L.Ed. 1062, "All this, however, is no more than to say that respondents' interference with the erection of the steel in New York will have the effect of interfering with the bringing of the steel from other states. Accepting the allegations of the bill at their full value, it results that the sole aim of the conspiracy was to halt or suppress local building operations as a means of compelling the employment of union labor, not for the purpose of affecting the sale or transit of materials in interstate commerce. Use of the materials was purely a local matter, and the suppression thereof the result of * * * a purely local aim. Restraint of interstate commerce was not an object of the conspiracy. Prevention of the local use was in no sense a means adopted to effect such a restraint. It is this exclusively local aim, and not the fortuitous and incidental effect upon interstate commerce, which gives character to the conspiracy. Compare Bedford Cut Stone Co. v. Stone Cutters' Assn., 274 U.S. 37, 46, 47, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Anderson v. Shipowners' Assn., 272 U.S. 359, 363, 364, 47 S.Ct. 125, 71 L.Ed. 298. If thereby the shipment of steel in interstate commerce was curtailed, that result was incidental, indirect, and remote, and, therefore, not within the anti-trust acts, as this court, prior to the filing of the present bill, had already held."

Further citation of authorities would serve no useful purpose. We therefore turn to the application of the principles enunciated to the case at bar.

#### The Principles of the Cited Cases as Applied to the Case at Bar.

The evidence in the case at bar, with the possible exception of the instance of the refusal of the appellants to permit finished goods to be shipped which we shall presently discuss, did not disclose an intent on the part of the appellants to restrain commerce. On the contrary their intent was to unionize the appellee's plant, an action local in motive and local in effect. The effect upon interstate commerce was merely indirect, incidental and remote. The appellants therefore were not guilty of engaging in a combination or conspiracy to restrain commerce. United Mine Workers v. Coronado Coal Co., first Coronado case, supra; United Leather Workers' In-

ternational Union v. Herkert, supra; Levering & G. Co. v. Morrin, supra.

Furthermore, although the appellee did a business in the manufacture and sale of full fashioned hosiery of approximately $5,000,000 a year, this was a small part of the total industry. In 1936, the annual national shipments of full fashioned hosiery were 37,400,782 dozen pairs. In 1937, the annual national shipments amounted to 39,678,494 dozen pairs. The record shows that during the last eight months of 1937, the appellee shipped 274,791 dozen pairs of stockings. Even if the appellee's output was quadrupled, it would amount to less than three percent of the total national output in the industry. The interruption of production incurred by the appellee through the acts of the appellants had small effect upon interstate commerce. The combination was not such that by reason of the intent of the conspirators or the inherent nature of their acts public interest was prejudiced by unduly restricting competition or obstructing trade. Appalachian Coals, Inc., supra, Nash v. United States, supra. It follows, we think, that the appellants were not guilty of violating the Sherman Act in refusing to permit the shipment of completed merchandise to fill orders outside the State of Pennsylvania. The appellees have, however, cited authorities in support of a contrary view, two of which require brief discussion.

In Buyer v. Guillan, 2 Cir., 271 F. 65, 16 A.L.R. 216, a combination between members of longshoremen's unions resulted in a refusal by longshoremen to handle goods brought to the docks by trucks driven by non-union men. This was held to be a combination in restraint of trade in violation of the Sherman Act and an injunction was issued. In O'Brien v. United States, 6 Cir., 290 F. 185, a strike was in progress at rolling mills at Newport, Kentucky. The mill management arranged to send a steel billet to a Cincinnati manufacturer. The manufacturer sent a truck to the mill to get the billet. The defendants induced the driver to unload the billet after it had been placed upon the truck, and were indicted under the Sherman Act. The Circuit Court of Appeals of the Sixth Circuit sustained the convictions of the defendants, stating 290 F. at page 187, "Not only was the billet 'prepared for delivery and marked,' but carriage across the river was in the natural course of business

at this point, and it is to be assumed that the truck carried the usual evidence that it was an Ohio car." The court went on to state that "* * * the existence of the offense is found not in the amount of commerce restrained, but in the direct and absolute character of the restraint."

In both of these cases the goods were actually in transit and in each case there was a secondary boycott of the kind which the Supreme Court had declared illegal in Duplex Printing Press Co. v. Deering, supra. Such elements are lacking in the case at bar. We do not think these cases controlling.

The decision of the Supreme Court in Industrial Association of San Francisco v. United States, 268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849, is illuminating upon this aspect of the case at bar. The defendants had proposed to eliminate trade union domination of the local building industry and had combined to establish open shop employment by causing building permits to be refused to those contractors who would not support the open shop plan. The district court enjoined this plan as a violation of the anti-trust laws, and found that permits were to be required for the purchase of building materials and supplies brought from other states into California and that even if limited to California produced materials, the permit system interfered with the free movement of building materials into California. The Supreme Court reversed this decree and ordered the bill dismissed, holding that interferences with materials shipped into California were widely separated and insignificant in view of the size of the local building industry and were therefore insufficient to establish a conspiracy in restraint of commerce.

Mr. Justice Sutherland, delivering the opinion of the Court, said 268 U.S. at page 84, 45 S.Ct. at page 408, 69 L.Ed. 849, "* * * the interferences which may have been unlawful are reduced to some three or four sporadic and doubtful instances, during a period of nearly two years. And when we consider that the aggregate value of the materials involved in these few and widely separated instances, was, at the utmost, a few thousand dollars, compared with an estimated expenditure of $100,000,000 in the construction of buildings in San Francisco during the same time, their weight, as evidence to establish a conspiracy to restrain interstate com-

merce or to establish such restraint in fact, becomes so insignificant as to call, for the application of the maxim, 'de minimus non curat lex.' To extend a statute intended to reach and suppress real interferences with the free flow of commerce among the states to a situation so equivocal and so lacking in substance would be to cast doubt upon the serious purpose with which it was framed."

We are of the opinion that the maxim is equally applicable to the appellant's refusal in the case at bar to permit shipments designated for interstate commerce to leave the Apex plant. This action, although clearly wrongful, did not bring their conspiracy within the prohibition of the Sherman Act. The evidence in the case at bar supports but one conclusion, namely that the interruption to commerce was by way of stoppage of the appellee's manufacturing operations, was comparatively slight and indirect, and that the intent and purpose of the appellants at the time of the formation of their conspiracy and thereafter was to unionize the Apex plant, not to restrain commerce or to affect prices within the industry. The verdict was necessarily based on the existence of an intent by the appellants to form a combination in restraint of trade and commerce. The record does not furnish support for the finding of such intent. It follows that the appellee failed to make out a case for treble damages under the Sherman and Clayton Acts, that the learned trial judge should have directed a verdict in favor of the appellants and that he erred in refusing to grant the appellants' motion to set aside the verdict and judgment against them and to enter judgment in their favor.

The National Labor Relations Act and the Decisions Construing it Do Not Expand the Meaning of the Word "Commerce" as Employed in the Anti-Trust Laws.

■ This court in its opinion in the injunction suit between these parties reported in 3 Cir., 90 F.2d 155, 159, reversing the decree of the district court, reported in D.C., 20 F.Supp. 138, placed emphasis upon an expanded meaning of the word "commerce" purportedly created by the National Labor Relations Act, 29 U.S.C.A. §§ 151–166, and the decisions of the Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed.

893, 108 A.L.R. 1352, and National Labor Relations Board v. Friedman-Harry Marks Clothing Company, 301 U.S. 58, 57 S.Ct. 630, 81 L.Ed. 921, 108 A.L.R. 1352. The word commerce under this expanded definition was construed to include the activities of the appellants and their agents. We now conclude that this was unwarranted.

Congress used a very broad word, "affect," in the National Labor Relations Act, thus evidencing its intention to embrace the entire field of interstate commerce confided to it by the Constitution. Upon the other hand in the Sherman Act, Congress employed the word "restraint," which has a different and plainly more restricted connotation. That this ·is so becomes the more obvious in the light of the Supreme Court decisions which we have already discussed, in which it is declared that Congress intended to legislate only in respect to unreasonable restraints of commerce. In other words, in order to come within the purview of the Sherman Act and thus to confer jurisdiction upon the Federal courts commerce must not only be affected, but also must be restrained and restrained to an unreasonable degree.

■ A somewhat similar contention was made in Blankenship v. Kurfman, 7 Cir., 96 F.2d 450, 456, and in respect to it the court stated: "The recent decisions in cases under the National Labor Relations Act, 29 U.S.C.A. §§ 151–166, are instructive for the purpose of determining whether certain activities affect commerce. But these cases do not involve the problem of determining the existence of a conspiracy or combination in restraint of commerce." The questions involved in the decisions of the Supreme Court in the Labor Board cases which we have cited were as to the extent of congressional power under the commerce clause of the Constitution. The question presented by the case at bar and by the earlier injunction proceedings is the extent to which Congress has exercised that power in the anti-trust laws. The latter question must be decided upon the authority of cases arising under and construing the anti-trust laws. The meaning of the words " * * * contract, combination * * * or conspiracy, in restraint of trade or commerce" employed in

Section 1 of the Sherman Act cannot be expanded by the definitions of the National Labor Relations Act or the cases construing that Act.

■ In the injunction proceedings this court concluded that because the appellants committed unlawful acts they were therefore guilty of a conspiracy in restraint of trade. This conclusion we now think was erroneous. The test is not whether unlawful acts were committed by the appellants but whether a combination or conspiracy was formed by them with the intent to restrain commerce. If such a conspiracy had been formed by them it would be in violation of the Sherman Act though carried out by entirely lawful and peaceable means. Duplex Printing Co. v. Deering, supra, 254 U.S. pages 467, 468, 41 S.Ct. pages 176, 177, 65 L.Ed. 349, 16 A.L.R. 196.

■ The decree of this court in Apex Hosiery Co. v. Leader, supra, was reversed by the Supreme Court with directions to dismiss the bill of complaint since the case was moot. Leader v. Apex Hosiery Co., 302 U.S. 656, 58 S.Ct. 362, 82 L.Ed. 508. The decree of this court in the injunction proceedings must therefore be considered as having been vacated. It is no longer binding as a precedent, as the law of the case, or as res judicata. South Spring Hill Gold Co. v. Amador Gold Co., 145 U.S. 300, 12 S.Ct. 921, 36 L.Ed. 712; Brownlow v. Schwartz, 261 U.S. 216, 43 S.Ct. 263, 67 L.Ed. 620. As a consequence we are at liberty to consider anew all questions presented by the record of the case at bar. But if this were not so we would now feel it necessary to overrule our decision in the former case, since, as we have shown, it was erroneous. Our judgment in this respect is confirmed by legal commentators generally. See 51 Harvard Law Review 169; 15 New·York University Law Quarterly Review, 135; 39 Columbia Law Review 1247.

■ The judgment of the court below is reversed and the cause is remanded with directions to enter judgment for the appellants in accordance with Rule 50(b) of the Federal Rules of Civil Procedure, 28 U. S.C.A. following section 723c.